Docket No. 89458–Agenda 5–September 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROOSEVELT LUCAS, Appellant.

JUSTICE FITZGERALD delivered the opinion of the court:

A jury found defendant, Roosevelt Lucas, guilty of first degree murder. The same jury found defendant eligible for death on the ground that the victim was a correctional officer and concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death, and this court affirmed defendant’s conviction and sentence on direct appeal. See 
People v. Lucas
, 151 Ill. 2d 461 (1992). Pursuant to the Illinois Post-Conviction Hearing Act, defendant petitioned the circuit court for post-conviction relief. 725 ILCS 5/122–1 
et seq
. (West 1996). Following a hearing on the State’s motion to dismiss, the circuit court dismissed defendant’s petition without an evidentiary hearing. Defendant appeals directly to this court (134 Ill. 2d R. 651(a)), and we now affirm the judgment of the circuit court.

BACKGROUND

On September 3, 1987, Robert Taylor, a superintendent at the Pontiac Correctional Center, was attacked while he worked in his office and died as a result of multiple stab wounds to his heart and multiple lacerations to his scalp caused by a blunt instrument. In our opinion on direct appeal we detailed the evidence presented against defendant at trial. 
Lucas
, 151 Ill. 2d at 468-76. In the instant appeal, we will only discuss the facts necessary to address the claims raised by defendant in his post-conviction petition.

At trial, the State presented several witnesses to prove that defendant and another inmate killed Taylor. Two inmates gave eyewitness testimony at trial. Inmate Lawrence Spillar testified that he was in Taylor’s office discussing his assignment to a painting detail when the attack began. Spillar testified that while he spoke with Taylor, inmate Ike Easley ran into Taylor’s office, jumped onto Taylor’s desk and began to hit and stab Taylor in the chest with a knife. Spillar attempted to flee the office, but was prevented from leaving when he collided with defendant at the door. Defendant and Spillar briefly struggled at the door until defendant pushed Spillar aside; Spillar then observed defendant rush towards Taylor and beat Taylor several times in the head with a pipe. Spillar stood at the door of Taylor’s office and watched as defendant and Easley discarded their weapons and ran. Inmate Demetre Brown testified that on the morning of the murder he saw Easley and defendant approach Taylor’s office prior to the attack; both wore hats and gloves. Brown testified that he watched Easley and defendant rush into Taylor’s office, and saw Easley stab Taylor repeatedly in the torso while defendant struck him repeatedly in the head with a metal pipe. After the attack, Brown also observed Easley and defendant run from the office, discarding their weapons as they ran. Defendant cross-examined each eyewitness regarding their prior convictions and gang affiliations. Spillar was the leader of the Stones, while Brown was a Vice Lord, an ally gang of the Stones. Defendant belonged to the Stones’ and Vice Lords’ rival gang, the Black Gangster Disciples (BGD), and conceded his membership in the gang at trial.

Another State witness, Officer Don Lyons, testified that immediately after the attack all inmates were secured in their cells. During his patrol of the cell-block one-half hour after the attack, he observed defendant inside his cell, naked waist-up, washing his arms, torso and hands. Lyons testified that this behavior was unusual because defendant’s cell-block had been given the opportunity to shower earlier that morning. Further, Lyons testified that unlike other inmates who stood at the front of their cells shouting to one another to learn about the attack, defendant asked no questions and seemed disinterested.

The State argued that Taylor’s murder was a retaliation killing by gang members of the BGD for the death of a fellow gang member, Billy “Zodiac” Jones, three months earlier at Pontiac. The State presented witnesses to show that defendant’s affiliation and leadership position within the BGD led to his participation in the killing. Further, the State offered witnesses to support its theory that the killing was retaliatory. Deputy Director Donald Long testified that his investigation confirmed that “the motive, as shown through the investigation, was that the murder of [Taylor] was a direct result of the death of inmate [Jones].” Inmate Harry Martin, a former BGD member, testified about the motive for the killing and discussed defendant’s participation in the killing. Martin first outlined the structure of the BGD and its activities, including extortion, gambling, prostitution, tax fraud, armed robbery and credit card fraud. Martin testified that he had gained information concerning the BGD’s structure and activities because he was previously a board member and financial advisor to Larry Hoover, the BGD’s chairman of the board. He explained, however, that in 1987 he began to cooperate with the Department of Corrections (DOC) because he learned that BGD gang members were planning to assassinate him:

“I was Larry’s financial adviser from 1984 until 1987. During that time we established policies for the institutions, throughout the state and all the states. One of the policies was no heroin inside of the institutions. No guns, no violence, etcetera, things that would stunt the financial growth of the organization. After Larry Hoover left in February or March [1987], the majority of the board were disgruntled by the policies that were established when he was there saw me as the stepping stone between what they wanted to do and what was going on at the time, so they put together a conspiracy to assinate [
sic
] me.

* * *

[The warden told me of the conspiracy to assassinate me.] When he told me this I didn’t believe it. I’d been a member of the B.O.S [BGD] all my life. I’d given my life to the organization. I was a Board member. I was–it made me mad, so I wouldn’t believe him. *** I went back and talked to a couple of board members who were my allies at the time, and they confirmed the conspiracy.

 * * *

I had a dilemma. I was in between assasinating [
sic
] seven members of the board or throwing away thirteen years of my life. So rather than become what they were, I threw away thirteen years and left the institution.”

Martin testified that only after he learned of the assassination plans against him did he begin to cooperate with the DOC. Martin further testified that he was introduced to Pontiac BGD members when he was transferred to that facility in 1987. He first met gang members in the cafeteria, including the BGD’s facility “co-chairman,” Corwyn “Ketchup” Brown. Martin testified that during this meeting with Ketchup defendant was present, and based upon defendant’s conduct he believed defendant was a member of the BGD’s security group called the United Front Organization (UFO). Specifically, he stated that he observed defendant “trailing” Ketchup and other board members, and observed defendant take orders from Ketchup. UFO members were protectors and responsible for security, making certain that members had weapons or body guards. Additionally, UFO members carried out attacks or murders against other inmates or prison staff. Martin testified that during this same meeting in the cafeteria, Ketchup conveyed the BGD’s outrage and hostility towards the administration for Jones’ death. Specifically, while the defendant was present, Martin was told by Ketchup that the BGD wanted to “retaliate against the administration.” On cross-examination, Martin admitted that his statement that defendant was a member of the UFO was an assumption based on his knowledge and experience of the gang structure and defendant’s conduct which fit the stereotypical characteristics of a UFO member. Defense counsel further cross-examined Martin regarding his motive to testify and asked specifically whether Martin received anything in exchange for his cooperation. Martin testified that he did not receive immunity for his testimony and was not offered anything in exchange for his testimony by either the prosecution or the DOC. Martin responded that the only thing he “received” for his testimony was “solitary confinement, a dead son, and my wife in exile.”

Two inmates, Darryl Knighten and Louis Roberson, testified for the defense. Knighten testified that he observed Taylor’s body lying on the ground in front of his office. He then saw an inmate called “Iron Man” enter Taylor’s office and stand by Taylor’s body. Knighten testified that he watched Iron Man reach for an object and eventually return to his cell. Next, Roberson testified that on his way to get a cup of coffee he passed defendant’s cell, where he saw defendant sitting. After he returned to his own cell, Roberson testified, he heard noises and stepped outside the cell to see what was causing the commotion. According to his testimony, he saw Taylor lying on the ground outside his office and, at the same time, saw defendant standing at the front of his own cell. However, on cross-examination Roberson admitted that he only saw defendant standing at the front of his cell after he heard the noise, and that he did not know if the noise he heard was the attack upon Taylor or instead the guards rushing to Taylor’s office after the attack.

The jury found defendant guilty of first degree murder and at a subsequent sentencing hearing found defendant eligible for the death sentence. After hearing evidence in aggravation and mitigation, the jury concluded there were no mitigating factors sufficient to preclude the death penalty and the trial court imposed the death penalty. On direct appeal, this court affirmed defendant’s conviction and sentence (
Lucas
, 151 Ill. 2d at 497-98). We now consider the circuit court’s dismissal of defendant’s post-conviction petition without an evidentiary hearing.

ANALYSIS

The Illinois Post-Conviction Hearing Act (Act) provides a procedural mechanism by which criminal defendants can assert that “in the proceedings which resulted in his or her conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both.” 725 ILCS 5/122–1(a) (West 1996). The purpose of the post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, nor could have been, adjudicated previously on direct appeal. 
People v. Morgan
, 187 Ill. 2d 500, 528 (1999). Therefore, a post-conviction petition is a collateral proceeding and does not relitigate a defendant’s innocence or guilt. 
People v. Evans
, 186 Ill. 2d 83, 89 (1999). Any issues considered by the court on direct appeal are barred by the doctrine of 
res judicata
, and issues which could have been raised on direct appeal are deemed waived. 
People v. West
, 187 Ill. 2d 418, 425 (1999).

A defendant is not entitled to an evidentiary hearing on his claims as a matter of right. Rather, a defendant is only entitled to an evidentiary hearing where the allegations contained in the petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a constitutional violation.
 People v. Orange
, 195 Ill. 2d 437, 448 (2001). A trial court must examine the legal sufficiency of the defendant’s allegations taking all well-pleaded facts as true. 
People v. Towns
, 182 Ill. 2d 491, 503 (1998). A trial court’s ruling on the sufficiency of defendant’s allegations is a legal determination and, therefore, we review 
de novo
 a trial court’s decision to dismiss the petition without an evidentiary hearing. 
People v. Coleman
, 183 Ill. 2d 366, 388 (1998). Defendant raises three claims for our review.

I. Ineffective Assistance of Counsel–Mitigation

Defendant first alleges that his trial counsel was ineffective because he failed to investigate and call numerous witnesses in mitigation. An appellate issue is moot when it is abstract or presents no controversy. 
People v. Blaylock
, 202 Ill. 2d 319 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. 
People v. Jackson
, 199 Ill. 2d 286, 294 (2002). We observe that subsequent to the filing of his appeal, the Governor commuted his death sentence to natural life imprisonment without the possibility of parole or mandatory supervised release. Commutation removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence. 
People ex rel. Johnson v. Murphy
, 257 Ill. 564, 566 (1913); Black’s Law Dictionary 274 (7th ed. 1999). Thus, the commutation has rendered this issue moot. See, 
e.g.
, 
Lewis v. Commonwealth
, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977); 
State v. Mitchell
, 239 Or. 87, 88, 396 P.2d 572, 573 (1964). We, therefore, address only the viable, nonsentencing issues.

II. State Witness Harry Martin–
Brady
 Violation

Defendant claims that his constitutional right to due process of law was violated at his trial when the State allowed its witness, Martin, to proffer perjured testimony. In his petition, defendant requests we grant him an evidentiary hearing on this claim. At trial, Martin testified that he had no cooperation agreement with the State in exchange for his testimony. Defendant contradicts this assertion with Martin’s affidavit, dated September 5, 1997. In the affidavit, originally filed in the case against defendant’s codefendant, Martin explains that he was compensated by the State for his cooperation in Taylor’s murder investigation:

“A day or two after I arrived at Pontiac, my wife visited me and told me that the word ‘in the street’ was that the BGDs were planning to assassinate me in prison. After visiting me, my wife went to Warden James Chrans’ office and told him the same thing. Chrans called me into his office that evening and said that he was not going to have me killed on his watch. He then transferred me to Logan Correctional Center. All of this happened within three days of my being sent to Pontiac.

*** Within a day or two after the murder of Robert Taylor on September 3, 1987, Russ Nelson [an investigator for the DOC] telephoned me at Logan. I took the call in an office there. Nelson asked me to help in their investigation of the murder. I refused.

*** The very next morning Warden Chrans telephoned me–I was again brought to an office to take the call–and reminded me that he had saved my life by sending me to Logan and I owed him a favor. I said I would listen to what the State had to say.

*** The next day, Gerald Long, a Deputy Director of DOC, and Jerry Donovan, a DOC investigator, came to Logan to see me. They said they needed my help ***.

*** At that same meeting, which took place at an office at Logan within a week of Taylor’s murder, we ironed out a deal, whereby Long and Donovan promised me the following benefits in return for my cooperation:

a. they would immediately move my wife and three children downstate so that they could be near me.

b. I would be allowed to make ‘home visits’ or furloughs, beginning immediately. Home visits consisted of leaving Logan once or twice a week to visit my wife and children. During these day and night visits, I was free to do whatever I wanted to do and go wherever I wanted to go.

c. I would get paid generously. They stressed that there was lots of different ways of paying me, including cash, commissary goods, witness funds, federal money and ‘O.A.F.’ funds (they did not say what that stood for).

d. All of the state officials with whom I cooperated, including Long, Donovan, McKinney, and Livingston County State’s Attorney’s lawyers Bernardi, Brown, and Wasson, would vouch for me in court or through clemency petitions to get me released from incarceration once the investigation and trials were completed. (At the time of this meeting, I had served about six years of two sentences totaling 45 years–10 from a Cook County conviction and 35 from a Du Page County conviction).

e. Long and Donovan said that the DOC Director would bring a clemency petition to the Governor to sign to make sure I was released, if the courts did not commute my sentences. (In fact, in October of 1990, Deputy Director Klemm took a clemency petition to the Governor, but I was out by the time the petition was decided.)

*** This ‘deal’ was set out on that first day I met with Long and Donovan at Logan. In subsequent meetings, details were ironed out, such as where the money would come from. (For example, Long gave me a DOC phone card number issued to Stu Erickson, by DOC, in September, 1987.) But the basic outline as set forth above was laid out before [September 17, 1987] ***.”

Additionally, defendant attaches the following exhibits to his post-conviction petition: a transcript of hearings held before the Honorable James F. Holderman of the United States District Court for the Northern District of Illinois, wherein Martin testified that his 1981 Du Page County sentences were reduced from 35 to 21 years because of his cooperation with the State; an October 1, 1991, order signed by a Du Page County circuit court judge reducing Martin’s time from 35 to 21 years, time considered served; a transcript of hearings held in the Cook County circuit court on February 17, 1994, wherein Martin testified about his cooperation with the State in order to reduce a 10-year sentence that was to run consecutively with the 35-year Du Page County sentence; and statements made by Martin’s attorney at the February 17, 1994, hearing providing that Martin’s cooperation agreement began with the State in 1987 and that “there was an agreement made if in fact [Martin] continued to cooperate with the Prosecuting authorities, we would be able to come before the sentencing Judge and there would be minimal or no opposition to relief requested. In fact, that was accomplished in Du Page County.” Thus, defendant claims that his right to due process of law was violated because this information was not tendered to him before his trial, nor did the State correct Martin’s testimony at trial that he had no cooperation agreement.

The State moved to dismiss defendant’s petition, and, therefore, we must take as true defendant’s allegations that Martin testified falsely about his cooperation agreement, and that the State knew that the testimony was perjured.
 Coleman
, 183 Ill. 2d at 390-91 (“By seeking to dismiss the post-conviction petition, the State assumed the truth of the factually supported allegations contained in that petition, at least for purposes of the motion. Therefore, the State, as the movant, has eliminated all factual issues from the inquiry”). A conviction obtained through the use of false testimony implicates due process concerns and is subject to reversal. 
Giglio v. United States
, 405 U.S. 150, 153-54, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972); 
Coleman
, 183 Ill. 2d at 391. We have held that where the State’s case includes perjured testimony, and the State knew, a “ ‘strict standard of materiality’ ” applies, and a court of review must overturn the conviction “if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.” 
Coleman
, 183 Ill. 2d at 392, citing 
United States v. Agurs
, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349-50, 96 S. Ct. 2392, 2397 (1976). “This standard is equivalent to the harmless error standard ***.” 
Olinger
, 176 Ill. 2d at 349, citing 
People v. McNeal
, 175 Ill. 2d 335, 354-55 (1997). The strict standard of materiality applies even if the State did not solicit the false testimony, but rather left it to go uncorrected. 
Olinger
, 176 Ill. 2d at 345.

Defendant argues that our decisions in 
Olinger
 and 
Steidl 
warrant an evidentiary hearing on his claim that, with the State’s knowledge, he was convicted on the basis of false testimony. In 
Olinger
, the defendant was convicted for the murder of three individuals. At trial, a State witness testified that he had been given immunity against prosecution for a burglary in exchange for his testimony against the defendant. In his post-conviction petition, the defendant attached evidence to show that the witness falsely testified about other promises made to him in return for his testimony, including a multijurisdictional deal and the dismissal of several other pending charges. We held that the defendant was entitled to an evidentiary hearing on his claim. 
Olinger
, 176 Ill. 2d at 350-51.

In 
Steidl
, the defendant was convicted for the murder of two individuals and subsequently sentenced to death. The State’s case included an eyewitness to the murders, who testified at trial that in return for her testimony she pled guilty to concealment of a homicidal death in exchange for a five-year sentence. However, she testified that she did not know of or expect a reward in return for her favorable testimony. Attached to the defendant’s post-conviction petition was evidence that the witness failed to disclose that she was to be paid $2,500 in relocation money after the trial. We reversed the dismissal of the defendant’s claim and held that the State’s knowing use of perjured testimony violated the defendant’s right to due process of law. 
Steidl
, 177 Ill. 2d at 261-62.

Defendant argues that, similar to 
Olinger
 and 
Steidl
, the State’s knowing use of perjured testimony prevented the jury from assessing the witness’ credibility or motive to testify falsely, such that he was prejudiced. We disagree that 
Olinger
 and 
Steidl
 control our decision in the instant matter. In 
Olinger
, we repeatedly observed that the State witness who testified falsely “was critical to the State’s case” and offered “[t]he most significant evidence” to connect the defendant to the three murders. 
Olinger
, 176 Ill. 2d at 338, 350. Specifically, we stated that the witness’ credibility was crucial to the State’s case because his testimony was the only evidence to connect the murder weapon to the defendant and the only evidence to supply motive. 
Olinger
, 176 Ill. 2d at 350. For this reason, the defendant was prejudiced. Furthermore, in 
Steidl
 the witness who falsely testified about her cooperation agreement was the State’s only direct identification witness. 
Steidl
, 177 Ill. 2d at 245-47. In fact, the witness participated in the crime and testified about the intimate details of the murder, including defendant’s participation during the killing. 
Steidl
, 177 Ill. 2d at 247. Conversely, in the instant case Martin did not offer direct identification evidence against defendant and did not connect defendant to the murder weapon. Rather, Martin testified in support of the State’s motive theory and notably did not provide the only evidence of motive. Therefore, in this case, we cannot equate the prejudice caused by the failure to disclose an agreement with a nonoccurrence witness with the prejudice caused by the State’s failure to disclose evidence of a cooperation agreement with a direct identification witness. That is, Martin’s testimony, although helpful, was not crucial to the State’s case.

Certainly, we do not condone the State’s use of perjured testimony, and in those cases where it is proven we condemn it.
(footnote: 1) The State had an obligation to correct the falsity (
Olinger
, 176 Ill. 2d at 347); however, whether defendant is entitled to an evidentiary hearing on his claim is a separate issue that requires us to consider whether defendant has made a substantial showing of a due process violation. That is, defendant is only entitled to an evidentiary hearing if there is a substantial showing of a reasonable likelihood that the false testimony could have affected the judgment of the jury. In this case, because the record contains overwhelming evidence of guilt, in the form of two eyewitnesses who offered identification testimony, we find that defendant does not make the requisite substantial showing.

Turning to the evidence, the State’s case primarily rested upon Spiller’s and Brown’s direct identification testimony. This direct identification testimony was bolstered by Officer Lyon’s description of defendant’s conduct following the killing and Deputy Director Long’s investigative findings, including his finding that the killing was motivated by retaliation. Deputy Director Long testified that: “The motive, as it was shown through the investigation, was that the murder of Superintendent Taylor was a direct result of the death of inmate Billy Jones.”

We also consider Martin’s testimony in this case. Martin, a motive witness, established that defendant was a member of the BGD; that defendant was a member of the UFO security faction; and that defendant was a party to a conversation concerning the BGD’s intent to retaliate against the administration for Jones’ death. This testimony was partially corroborated by defendant, who admitted he was a member of the BGD, and Deputy Director Long, who, as noted, testified that the killing was retaliatory. Furthermore, Martin’s statement that defendant was a UFO member, although never corroborated, was weakened by a successful cross-examination during which Martin admitted that he only assumed defendant was a member of the UFO. Thus, the only uncorroborated aspects of Martin’s testimony were his general descriptions of the gang structure and his placing defendant within the UFO security faction and at a conversation concerning the BGD’s intent to retaliate.

Importantly, the issue of whether Martin’s uncorroborated testimony was so crucial to the State’s case that defendant was prejudiced by Martin’s false testimony is answered by our decision on direct appeal. On direct appeal, we first discussed the evidence under a harmless error analysis. 
Lucas
, 151 Ill. 2d at 478. Specifically, we examined the admission of a correctional officer’s testimony that after Jones’ death BGD members, other than the defendant, frequently threatened him with physical harm. Like Martin’s testimony, the State presented the correctional officer’s testimony to show evidence of motive. Again, our review of defendant’s claim in the instant appeal is equivalent to the harmless error standard we applied on direct review. 
Olinger
, 176 Ill. 2d at 349. Therefore, our comments on direct appeal concerning the overall evidence of guilt are instructive in this matter:

“[T]he admission [of Officer’s Jarrett’s testimony that he was threatened] did not affect the outcome of the trial, and we hold that the erroneous admission of the evidence was harmless. *** [The improper testimony] did not go to the heart of the case; *** [the jury] still had to decide whether defendant had murdered Taylor. 
The proof of defendant’s guilt was overwhelming. There was direct identification of defendant by two eyewitnesses as having seen defendant in Taylor’s office and beat him over the head with a pipe. 
One defense witness testified that he saw an inmate walking around Taylor’s body after he had been attacked and another testified that he saw defendant in his cell around the time of the murder, although he did not know when the attack took place. This evidence can hardly be equated to the testimonies of two witnesses present when the attack occurred.” (Emphasis added.) 
Lucas
, 151 Ill. 2d at 478.

A second time on direct appeal, we examined the balance of the evidence within our discussion of the plain error rule.
 Lucas
, 151 Ill. 2d at 482. Specifically, we examined whether the admission of hearsay evidence introduced to show motive, including Martin’s testimony that he was told the BGD planned to retaliate against the administration for Jones’ death, warranted our review. We held that our review was not warranted under the plain error rule because the overall evidence was neither closely balanced, nor was the error so fundamental as to deny defendant a fair trial. 
Lucas
, 151 Ill. 2d at 482. We stated that the evidence in support of defendant’s conviction included the testimony of two eyewitnesses, who identified defendant as the individual who beat Taylor over the head with a pipe.
 Lucas
, 151 Ill. 2d at 482. Once again we held that the evidence was “direct and overwhelming” and “plainly not closely balanced” such that we refused to consider the issues found waived under the plain error rule. 
Lucas
, 151 Ill. 2d at 482, 484. Further, we stated that the admission of the hearsay evidence did not affect the outcome of the case: “[w]hile evidence of motive may be helpful to understand the reason why a crime was committed, it is not essential to conviction. Had this evidence been excluded, the evidence in support of defendant’s conviction remains.” 
Lucas
, 151 Ill. 2d at 482. Accordingly, defendant was not denied a fair trial. 
Lucas
, 151 Ill. 2d at 482.

While we considered different issues on direct appeal, our characterization of the evidence in this case does not change. Defendant was convicted on the basis of overwhelming evidence–the testimony of two eyewitnesses who observed defendant participate in the killing. These two eyewitnesses convincingly described the attack in great detail, including the manner of the attack, the weapons used during the attack, and the assailant’s clothing. More importantly, the two eyewitnesses identified defendant as one assailant. We cannot equate Martin’s uncorroborated testimony–testimony which did not place defendant at the scene of the attack or with a weapon–to the eyewitness’ testimony. Accordingly, we find that the instant case does not present facts which demonstrate that there is a reasonable likelihood that the false testimony affected the judgment against him. Because defendant does not establish materiality, the circuit court correctly dismissed defendant’s claim without an evidentiary hearing.

III. Post-Conviction Discovery

Defendant also argues that the circuit court improperly vacated existing discovery orders and wrongly denied a later request for discovery. Accordingly, defendant asks this court to remand for discovery on his claim that Martin falsely testified about his cooperation agreement and that the State knew his testimony was perjured.

After filing his post-conviction petition, defendant filed a motion for discovery and a motion for subpoenas. In particular, defendant requested information concerning State witness Martin, including Martin’s state and federal prison records, all documents, notes, or oral transcripts of agreements between Martin and state authorities, and copies of all documents concerning Du Page County and federal court cases in which Martin was involved. On February 2, 1994, the trial judge, Judge Glennon, ordered that the Illinois DOC, the United States DOC, and the Du Page County circuit court clerk tender to defense counsel all copies and master files concerning Martin. These files were previously impounded by the Du Page County circuit court in 1991. Several months later, on June 8, 1994, Judge Glennon ordered both the Du Page County court reporter and the county clerk for the second division to transcribe and tender a complete record of all cases pertaining to Martin for his in camera inspection. On January 29, 1996, Judge Glennon reviewed portions of the files requested, copied and furnished the material to the defense.

On November 12, 1998, Judge Glennon, who had presided over the trial, sentencing, and subsequent post-conviction proceedings, retired. The case was reassigned. Upon reassignment, the new trial judge, Judge Frobish, after reviewing the transcripts, order, and file in the case, vacated all previously ordered discovery in a written order. The written order concluded that defendant failed to show good cause for the discovery sought. However, the order granted defendant five weeks to resubmit “any discovery request to the attention of the court.” On December 17, 1998, defendant resubmitted his previous request for the same material, and following oral argument on March 11, 1999, the circuit court denied defendant’s request for further discovery. In his post-conviction petition, defendant claims that Judge Frobish abused his discretion when he 
sua sponte
 vacated all previous discovery orders and denied the later request for discovery.

We have held that the circuit court has inherent authority to order discovery in the context of post-conviction proceedings. 
People ex rel. Daley v. Fitzgerald
, 123 Ill. 2d 175, 183 (1988). A circuit court may grant discovery, but only after a hearing for “good cause shown.” 
Daley
, 123 Ill. 2d at 183. However, because there exists the potential for abuse of the discovery process in post-conviction proceedings, courts must exercise discretion in granting discovery requests. 
Daley
, 123 Ill. 2d at 183. In deciding whether to grant discovery, courts may consider “the scope of the discovery sought, the length of time between the conviction and the post-conviction proceeding, the burden [of granting the discovery] ***, and the availability of the desired evidence through other sources.” 
Daley
, 123 Ill. 2d at 183-84. A circuit court’s denial of a discovery request will not be disturbed absent an abuse of this discretion. 
People v. Fair
, 193 Ill. 2d 256, 264-65 (2000).

We first turn to Judge Frobish’s order vacating existing discovery orders upon his assignment to the case. At the time this case was reassigned, post-conviction proceedings were approaching five years in duration. Judge Frobish examined transcripts and prior discovery orders at length before he entered a written order vacating the prior discovery order. The record shows that Judge Frobish observed that some of the discovery material requested dated back approximately 11 years and included voluminous amounts of documents. Quoting Judge Glennon, Judge Frobish stated in his written order: “The amount of material here will consist of stacks of material, I don’t know, 8 feet–10 feet high. I am not sure. I mean, it is a tremendous amount of material,” and “I reviewed thousands of pages of inmate files, and I mean thousands of pages, over the course of a number of months. *** We were running a copier for days in my office furnishing material [to defense counsel].” Further quoting Judge Glennon, Judge Frobish noted Judge Glennon’s growing concerns with the scope of discovery:

“I think we are going to need to talk seriously about discovery at this point. And hear some arguments on what authority the defense has for much of their requests for their requests for the type of discovery they are seeking. *** And I would express for the record that we seem to have gone wildly beyond those general ground rules [for post-conviction discovery]. And I have been doing some thinking about that. And I think we are going to need to talk about that in order to reach some resolution ***.

* * *

*** Well, I think the record in this case is becoming perhaps an example of what post-conviction proceedings are not intended to do. Part of that has been through my own fault.

* * *

I am not going to extend in this case discovery in my opinion that would take a ‘quantum leap’ beyond what the law allows, or more fundamentally, what I feel is appropriate, fair and just.”

After reviewing the record, including Judge Glennon’s comments, and the large scope of discovery requested, Judge Frobish concluded that defendant did not establish the requisite good cause for continued post-conviction discovery. It is clear that Judge Frobish based his order on the appropriate considerations outlined in 
Daley
, such as the scope of discovery sought, the continued burden of production on the parties, the availability of the desired evidence, and the length of time between the conviction and the post-conviction proceeding. 
Daley
, 123 Ill. 2d at 183-84. Accordingly, we find no evidence to suggest Judge Frobish abused his discretion in his November 12, 1998, written order vacating the existing post-conviction discovery order.

We further reject defendant’s claim that Judge Frobish abused his discretion by denying defendant’s subsequent discovery request. After four years of extensive discovery, Judge Frobish granted defendant the opportunity to resubmit his discovery requests. Defendant filed a request substantially similar to, and equally extensive as, his initial discovery request. Defendant argued that defendant needed “substantial discovery, because the puzzle pieces *** are spread out over the years throughout the different systems *** [a]nd that with depositions or possibly live witness testimony, we can make the case that [defendant] was deprived of the necessary information that he needed” to cast doubt on Martin’s credibility.

On March 11, 1999, at the hearing to show good cause for the discovery request, defendant explained that he sought the information requested in order to amend his petition and stated that he was “willing to defer [the discovery] request, obviously, until after the petition is filed in its final form and the State has responded with a motion to dismiss.” The State agreed. The State further argued, however, that it did not possess or have control over the material requested, that the material requested was too broad, and that the majority of material sought was not relevant to defendant’s claim. The circuit court held that “no discovery is needed in order to put the defense in a position [to amend the petition],” and further held that defendant failed to show good cause because Martin’s alleged bias was collateral and added little additional value to the trial. Specifically, according to the circuit court, whether Martin was truthful about his cooperation was “irrelevant” based on defendant’s admission during trial that he was a member of the BGD, such that Martin’s testimony about defendant’s gang membership only reaffirmed that fact.

As an initial matter, we note that defendant now argues before this court a position opposite of the one that he took before Judge Frobish. At the hearing on his discovery request, defense counsel readily admitted that he had sufficient information to amend the petition and was willing to defer the request. Defendant did in fact amend his petition. The State filed its motion to dismiss, which was ultimately granted, and the discovery request was not revisited. Nevertheless, we conclude that Judge Frobish did not abuse his discretion in denying defendant’s subsequent discovery request. The record shows Judge Frobish considered appropriate factors, such as the protracted discovery in the case, the wide breadth of material sought in defendant’s discovery request, the great burden of production on the parties, and the likely unavailability of the desired evidence a second time. Further, as we have already held, the evidence against defendant was overwhelming and defendant was not prejudiced by Martin’s false testimony.

CONCLUSION

For the reasons stated, the judgment of the circuit court dismissing defendant’s petition without an evidentiary hearing is affirmed.

Affirmed
.

FOOTNOTES
1:     
1
Again, for purposes of this appeal, we only accept as true the allegations that Martin testified falsely and that the State knew that the testimony was perjured because the State moved to dismiss defendant’s petition. 
Coleman
, 183 Ill. 2d at 390-91.