2020 IL App (1st) 170375-U

SIXTH DIVISION
April 24, 2020

No. 1-17-0375

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 17881 |
| | ) | |
| CORDELL THORN, | ) | Honorable |
| | ) | Diane Gordon Cannon, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the trial court's order dismissing defendant's postconviction petition because he failed to make a substantial showing that appellate counsel was ineffective for failing to raise an alleged due process violation on direct appeal.

¶ 2    Defendant Cordell Thorn appeals the trial court's order granting the State's motion to dismiss his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). He argues his petition was erroneously dismissed during second-stage proceedings because he made a substantial showing that appellate counsel was ineffective for failing to argue on direct appeal that his due process rights were violated when the State elicited

perjured testimony. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Following a jury trial, Mr. Thorn was convicted of first degree murder and aggravated battery with a firearm and sentenced to consecutive terms of 45 and 10 years' imprisonment. We set forth the facts on Mr. Thorn's direct appeal (*People v. Thorn*, No. 1-08-1673 (Dec. 23, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23)), and we recite them here to the extent necessary to our disposition.

¶ 5      Mr. Thorn was charged with first degree murder and aggravated battery with a firearm based on a shooting that occurred on June 26, 2005, on South Sangamon Street. Stacey Anderson was killed in the shooting and Anthony Miller was shot in the foot.

¶ 6      Prior to trial, Mr. Thorn moved to suppress the identification testimony of two of the State's witnesses, Gloria Jones and Willie Triplett, arguing the photographic array and physical lineups in which Mr. Thorn had been identified were suggestive.

¶ 7      At the hearing on Mr. Thorn's motion, Ms. Jones testified as follows. She was on the front porch of her residence on South Sangamon Street at 2:55 a.m. on the day of the shooting. Ms. Anderson, Mr. Miller, and Lorenzo Hicks were also present. A shooting occurred and the police arrived soon after. Ms. Jones described the shooter to police as being a black man and wearing a white t-shirt "about a size 3X," light jeans, and Air Force Ones. At her home later that day, Detective John Otto asked her to look at "about one or two" photographs of "guys." The photographs were in color. The officer instructed her that, if the shooter was not in the photographs, she did not have to point anyone out. Defense counsel asked, "Would it be fair to say at that time you weren't able to make an identification?" Ms. Jones responded, "Of the persons in the pictures no, I was not."

¶ 8 A week later, police asked Ms. Jones to view a lineup, telling her if she "didn't see the guy it's okay." Ms. Jones identified Mr. Thorn in the physical lineup. She saw Mr. Thorn in both the lineup and the "one or two pictures" that she had previously seen. She had not known Mr. Thorn prior to the shooting.

¶ 9 On cross-examination, Ms. Jones testified that she identified Mr. Thorn in the lineup because she witnessed him shoot Ms. Anderson and not because a detective had showed her his photograph on the day of the shooting.

¶ 10 Chicago police detective John Otto also testified at the hearing on the motion to suppress that he showed a photographic array to Mr. Triplett on June 27, 2005. He compiled the photo array based on information he received from a person in custody on an unrelated charge who named Mr. Thorn in connection with the shooting. Mr. Triplett identified Mr. Thorn as the shooter in both the photo array and a physical lineup. After Detective Otto testified that Ms. Jones identified Mr. Thorn in a separate physical lineup, defense counsel asked, "And of the five individuals in that lineup, had any of those five individuals been in the photo array other than [Mr. Thorn]?" Detective Otto responded, "No." Mr. Hicks also viewed a physical lineup but did not identify anyone.

¶ 11 In support of the motion, defense counsel argued Mr. Thorn's picture was "shown to Gloria Jones and Willie Triplett in a photo array" and requested to reopen Mr. Thorn's case to introduce into evidence the photo array. The assistant state's attorney (ASA) stated, "We'll stipulate to its admission, Judge." Defense counsel argued Ms. Jones was unable to make an identification from the photo array, it was "suggestive" that no one in the photo array except Mr. Thorn appeared in the lineup, and Ms. Jones "wasn't even shown a series of six photographs. She was shown one or two pictures."

¶ 12 The court denied Mr. Thorn's motion to suppress identification, finding the identification

procedures were proper. With respect to Ms. Jones, the court noted that she "did not make a photo identification. She made a lineup identification after being shown photo [*sic*] of the defendant and not making an identification."

¶ 13 At trial, Mr. Triplett testified that he was "working on" his car, which was parked on Sangamon Street near the intersection of 118th Street, at around 11 p.m. on June 25, 2005. Streetlights illuminated the area. Mr. Triplett's son was across the street at Ms. Jones's house. Mr. Triplett noticed a green van circling the block approximately four times. Subsequently, two men walked through a nearby vacant lot, which Mr. Triplett viewed from about 10 feet away. After the men passed, Mr. Triplett heard about 10 gunshots. He ducked into his car and then looked up and observed the same two men running through the vacant lot. Mr. Thorn was one of the men. Mr. Triplett got a good look at Mr. Thorn because Mr. Thorn was closer to him. Mr. Thorn wore a dark-colored hooded sweatshirt. Mr. Triplett went to Ms. Jones's house and learned that Ms. Anderson and Mr. Miller had been shot.

¶ 14 On June 26, 2005, Mr. Triplett identified Mr. Thorn in a photo array as one of the men he observed pass his car. He later identified Mr. Thorn in a physical lineup on July 4, 2005.

¶ 15 Mr. Miller testified that he was sitting on the front porch of Ms. Jones's home with Ms. Jones and Ms. Anderson on the day of the shooting. Mr. Hicks arrived at approximately 2:50 a.m. and was standing on the sidewalk outside of the front gate. Mr. Miller heard approximately nine gunshots and, when he stood up to see where they originated, he felt a pain in his right foot. Ms. Jones helped him into her house and then pulled Ms. Anderson, who had been lying face-down in the door, inside as well. Mr. Miller could not identify the shooter.

¶ 16 Ms. Jones corroborated Mr. Miller's version of events. She testified that her porch light was on and a streetlight across the street was lit. The shooting started shortly after Mr. Hicks

arrived and came from bushes "on the other side of [her] house." Ms. Jones could not see the shooter initially but got a good look at him when he emerged from the bushes and fired 5 to 10 shots towards the front of her house. Ms. Jones asked him why he was shooting at her house. She observed him for 10 to 15 seconds and was approximately five feet away from him. Ms. Jones identified Mr. Thorn in court as the shooter. Mr. Hicks pushed his way inside her house before everyone else. Ms. Jones helped both Mr. Miller and Ms. Anderson inside because both had been shot. After the shooting, Mr. Thorn fled.

¶ 17    Ms. Jones testified at trial that on the day after the shooting, Detectives Otto and James Butler came to her house. The detectives asked Ms. Jones to look at "some pictures." Ms. Jones testified she did not look at them "[b]ecause I told them I wanted to see [the shooter] in person." The detectives "put the photos out" but Ms. Jones declined to look at them. She did not make an identification from the photos and reiterated that she wanted to see the shooter's "face in person." Ms. Jones testified that she later identified Mr. Thorn in a lineup as the person who shot at her house. Ms. Jones gave a handwritten statement to ASA Vicky Ciszek.

¶ 18    On cross-examination, Ms. Jones acknowledged testifying at the pretrial hearing on Mr. Thorn's motion to suppress identification testimony. When defense counsel read various questions and answers relating to her testimony at the hearing, Ms. Jones acknowledged her prior testimony. Specifically, Ms. Jones acknowledged that she previously testified that she was asked to view "one or two" pictures of "guys," the photos were in color, she was told by police that she did not have to identify anyone if she did not see the shooter in the photos, and she answered she was not able to make an identification "[o]f the persons in the pictures."

¶ 19    On redirect, the State asked Ms. Jones to explain why she previously testified that she was not able to make an identification of the people in the photographs when Detectives Otto and Butler

showed her a photo array on the day after the shooting. Ms. Jones clarified that she was not able to make an identification because she "didn't want to look at the pictures." She again explained that she did not look at the photos, but she noticed that they were color photographs.

¶ 20    Detective James Butler testified that he and Detective Otto learned about Mr. Triplett and Mr. Thorn from Antonio Williams. They located Mr. Triplett, who identified Mr. Thorn in a photo array as one of the men who ran past his car following the shooting. The detectives then interviewed Ms. Jones and asked her to view a photo array, which she refused to do. Ms. Jones later identified Mr. Thorn in a lineup as the shooter.

¶ 21    Detective Butler spoke with Mr. Thorn multiple times. Mr. Thorn initially denied being in the vicinity of the shooting. He gave three different accounts of where he was at the time of the shooting. After learning that he had been identified in a lineup, Mr. Thorn asked to speak with Detective Butler again to "tell the truth." Mr. Thorn told the detectives that on the night of the shooting he was with his friends "Clee," "Man-Man," and "Fat Folks" driving around in a van. Clee was driving, Man-Man was in the front passenger seat, and Mr. Thorn and Fat Folks were in the backseat. The men drove around looking for Mr. Hicks. Mr. Thorn wanted to shoot Mr. Hicks, who had shot at him the week before.

¶ 22    When the men observed Mr. Hicks walking on Sangamon Street near 117th Street, Clee parked around the corner on 118th Street. Mr. Thorn and Fat Folks "cut through" a vacant lot and walked on Sangamon Street. Mr. Thorn carried a black 9-millimeter semiautomatic handgun in his pocket and hid in the bushes near the house at which Mr. Hicks was standing. Mr. Thorn then emerged from the bushes and shot at Mr. Hicks. Following the shooting, he fled with Fat Folks.

¶ 23    Mr. Thorn gave a handwritten statement, which largely mirrored the account he gave Detective Butler. In his statement, Mr. Thorn said that the men drove the van down Sangamon

Street several times in an effort to locate Mr. Hicks. Additionally, Mr. Thorn added that after he began shooting, Mr. Hicks ran from the gate in front of the house to the porch. Mr. Thorn "got exactly in front of the porch" and saw five other people on the porch "fighting to get inside the house." He and Fat Folks ran through the vacant lot after the shooting. Detective Otto's testimony was substantially similar to Detective Butler's.

¶ 24    ASA Ciszek testified she took Mr. Thorn's handwritten statement, which was published to the jury. ASA Ciszek spoke to Mr. Thorn without the detectives present, and he informed her that he had been treated fine by the detectives and was not threatened by them.

¶ 25    Sirwanta Terry testified for the defense. She had known Mr. Thorn, who was "like [her] surrogate son," for six years. Mr. Thorn lived with her in spring of 2005 until he was arrested on July 2, 2005. He had a 10:30 p.m. curfew. He was home before his curfew every day except the day he was arrested. Ms. Terry testified Mr. Thorn could not have committed the shooting because he was home with her at the time. She acknowledged she did not provide police with that information. Mr. Thorn lived in her basement, which she admitted had a door leading outside.

¶ 26    Mr. Thorn testified he lived with Ms. Terry in June 2005 and followed a curfew as a condition to living with her. He was arrested for trespassing and, while in custody, participated in several lineups. He denied being advised of his *Miranda* rights. The detectives told Mr. Thorn that his name "came up in murders" and asked for his whereabouts on several dates. He informed them that he was at Ms. Terry's house on June 26, 2005, and gave them her address and telephone number.

¶ 27    Several hours after the initial interview, Detective Otto interviewed Mr. Thorn again and asked if he knew the name of someone who drove a green van. Mr. Thorn gave Detective Otto the name Fat Folks, and also named Clee and Man-Man. Detective Otto asked Mr. Thorn to testify

against the men, but Mr. Thorn refused. Detective Otto then punched Mr. Thorn's chest, grabbed his head and neck, and rammed his head into the wall. Detective Otto threatened Mr. Thorn by saying, "don't you know you can end up dead in here, hurt, and I can charge you with something else[?]" Mr. Thorn subsequently agreed to cooperate, and Detective Otto instructed him on what to say to ASA Kelly Boylan. Pursuant to Detective Otto's instructions, Mr. Thorn told ASA Boylan that he was advised of his *Miranda* rights, allowed to use the bathroom, giving the statement freely, and given food and water. Once the detectives left the room, Mr. Thorn told ASA Boylan that they forced him to give the statement and asked for a lawyer. After he requested counsel, ASA Boylan left the room.

¶ 28    Detective Otto returned to the room and again rammed Mr. Thorn's head and choked him. Detective Otto asked him to cooperate and Mr. Thorn agreed. After 45 minutes, ASA Ciszek took Mr. Thorn's statement. He did not inform ASA Ciszek about his treatment by police.

¶ 29    In rebuttal, Detective Otto testified that Mr. Thorn did not tell him that he had been living with Ms. Terry on the night of the shooting. He also denied instructing Mr. Thorn on what to tell the ASAs. Further, Detective Otto denied hitting or choking Mr. Thorn.

¶ 30    The jury sent out a series of jury notes indicating they were hung. One note stated several jurors did not believe Ms. Jones's testimony and believed Detective Otto choked and strangled Mr. Thorn to get a confession. However, ultimately the jury found Mr. Thorn guilty of first degree murder and aggravated battery with a firearm. The court sentenced Mr. Thorn to consecutive sentences of 45 years for first degree murder and personally discharging a firearm that caused the death of Ms. Anderson and 10 years for aggravated battery with a firearm.

¶ 31    We affirmed on direct appeal. *Thorn*, No. 1-08-1673 (Dec. 23, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23). In relevant part, we found the evidence was sufficient

to sustain Mr. Thorn's convictions over his contention that Ms. Jones's identification was not credible and repeatedly impeached. *Id.* at 23-25.

¶ 32    On November 21, 2011, Mr. Thorn filed a *pro se* postconviction petition, alleging, among other claims, ineffective assistance of appellate counsel for failing to argue on direct appeal "any legal issue regarding the impeachment of *** Ms. Jones." On August 17, 2012, the court docketed Mr. Thorn's petition for second-stage proceedings, noting more than 90 days had elapsed since it was filed, and appointed counsel.

¶ 33    On August 6, 2013, postconviction counsel filed a Rule 651(c) certificate and supplemental postconviction petition. In the supplemental petition, postconviction counsel argued, in relevant part, that appellate counsel was ineffective for failing to raise a reasonable doubt claim where there was "clear impeachment of State witnesses as to whether police did or did not contaminate line-up identification by showing eyewitness [Mr. Thorn]'s photograph." Counsel argued that Ms. Jones's pretrial and trial testimony and Detective Otto's trial testimony were inconsistent and raised reasonable doubt that Ms. Jones "credibly identified" Mr. Thorn in a lineup.

¶ 34    On February 19, 2014, Mr. Thorn filed a *pro se* "motion to dismiss postconviction counsel and to strike supplemental petition filed by counsel on August 6, 2013." In his motion, Mr. Thorn stated he "specifically asked counsel to raise his false testimony claim relative to Gloria Jones and Chicago police detective Otto," yet counsel failed to address the claim in the supplemental petition.

¶ 35    On September 25, 2014, the court granted postconviction counsel leave to file a "first amended supplemental petition for postconviction relief" as "an exhibit of the representation [Mr. Thorn] received" from the Office of the Public Defender. In the amended supplemental petition, postconviction counsel added Mr. Thorn's contention that his due process rights were violated when the State elicited perjury from Ms. Jones at trial. In the hearing, Mr. Thorn reiterated that he

wished to represent himself, and the court granted him leave to proceed *pro se*.

¶ 36    Mr. Thorn subsequently filed a *pro se* "first amended supplemental petition for postconviction relief." In his amended petition, Mr. Thorn incorporated the September 25, 2014, amended supplemental petition filed as an exhibit by postconviction counsel, and added two additional claims, including that "appellate counsel should have known the statutory difference between inconsistent statements and perjury."

¶ 37    On April 27, 2015, the State filed a motion to dismiss Mr. Thorn's petition. On July 14, 2016, the court granted the State's motion to dismiss. Mr. Thorn subsequently filed a motion to reconsider, which the court denied on December 1, 2016.

¶ 38                              II. JURISDICTION

¶ 39    Mr. Thorn filed his notice of appeal on January 13, 2017, and this court allowed his motion for leave to file a late notice of appeal on February 28, 2017. We thus have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rules 606 and 651, governing criminal appeals and appeals from final judgments in postconviction proceedings (Ill. S. Ct. R. 606 (eff. Mar. 20, 2009); R. 651(a) (eff. Dec. 1, 1984)).

¶ 40                              III. ANALYSIS

¶ 41    On appeal, Mr. Thorn contends that the trial court erroneously dismissed his petition because he made a substantial showing that appellate counsel was ineffective for failing to argue on direct appeal that his due process rights were violated when the State elicited perjured testimony from Ms. Jones. Because we find that this argument on appeal would not have been meritorious, we reject Mr. Thorn's claim of ineffective assistance of appellate counsel.

¶ 42    The Act provides for a three-stage process by which a defendant may assert his conviction was the result of a substantial denial of his constitutional rights. *People v. Beaman*, 229 Ill. 2d 56,

71 (2008). At the first stage, the trial court must review the postconviction petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). If the petition is not dismissed within 90 days at the first stage, counsel is appointed and it advances to the second stage. 725 ILCS 5/122-2.1(a), (b) (West 2010).

¶ 43     This case involves the second stage of postconviction proceedings. At the second stage of postconviction proceedings, the dismissal of a petition is warranted only when the allegations in the petition, liberally construed in light of the original trial record, fail to make a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). At this stage, the trial court is "concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act" (*People v. Coleman,* 183 Ill. 2d 366, 380 (1998)), and "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true" (*People v. Pendleton,* 223 Ill. 2d 458, 473 (2006)). The defendant "bears the burden of making a substantial showing of a constitutional violation." *Id.* We review *de novo* the trial court's dismissal of a defendant's postconviction petition without an evidentiary hearing. *Id*.

¶ 44     A defendant is guaranteed the right to the effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. art. I, § 8. Claims of ineffective assistance of appellate counsel are evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Makiel*, 358 Ill. App. 3d 102, 105 (2004). Under *Strickland*, a defendant must prove that counsel's performance fell below an objective standard of reasonableness and that this substandard performance prejudiced him by creating a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *People v. Wheeler*, 401 Ill. App. 3d 304, 313 (2010). Where a defendant argues that

appellate counsel was ineffective for failing to argue an issue on direct appeal, under *Strickland* he must show that (1) the failure was objectively unreasonable, and (2) he was prejudiced by the decision. *Makiel*, 358 Ill. App. 3d at 112-13.

¶ 45    Appellate counsel is not required to brief every conceivable issue on appeal, and counsel is not incompetent for choosing not to raise meritless issues. *People v. Easley*, 192 Ill. 2d 307, 328 (2000). Where an underlying issue lacks merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). A defendant must establish both prongs of the *Strickland* test and, therefore, a reviewing court need not address counsel's alleged deficiencies if he fails to establish any prejudice. See *Strickland*, 466 U.S. at 687; *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Our supreme court has held that "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). The defendant has the burden of establishing any such prejudice. *People v. Glenn*, 363 Ill. App. 3d 170, 173 (2006). Thus, at the second stage of proceedings, a defendant has the burden of making a substantial showing that a reasonable probability exists that the outcome of the proceedings, here Mr. Thorn's appeal, would have been different had counsel's performance been different. *People v. Harris*, 206 Ill. 2d 293, 307 (2002); *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). This obviously requires a showing that the argument that Mr. Thorn claims his lawyer should have raised on appeal had merit.

¶ 46    Mr. Thorn argues appellate counsel should have raised a due process claim on direct appeal relating to the State's allegedly intentional elicitation of Ms. Jones's perjured testimony at trial. Specifically, Mr. Thorn contends that Ms. Jones testified at the pretrial hearing that she viewed a photo array that the detectives presented to her and was unable to identify the shooter but at trial testified that she refused to view the photo array because she wanted to identify the shooter

in person. Mr. Thorn argues that Ms. Jones's trial testimony was material to his conviction because it bolstered her lineup identification of Mr. Thorn, which was "questionable to begin with," as shown by the jury's notes to the trial court. He contends that if counsel had raised the issue on direct appeal, his conviction would have been reversed because Ms. Jones's false testimony affected the jury's verdict.

¶ 47    Our supreme court has ruled that it is "well-established that the State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law." *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). A conviction obtained by this use of false testimony must be set aside "if there is a reasonable likelihood that the false testimony could have affected the verdict." *People v. Thurman*, 337 Ill. App. 3d 1029, 1032 (2003); see also *People v. Lucas*, 203 Ill. 2d 410, 424 (2002).

¶ 48    This rule has been applied where a witness testifies falsely about what concessions he or she has been offered by the government in exchange for testimony against the defendant. In *Olinger*, for example, the State's star witness testified that he was only given immunity from prosecution for one crime in exchange for his testimony, when in fact he had obtained a "multijurisdictional deal which included the dismissal of a number of other changes pending against him." *Olinger*, 176 Ill. 2d at 346. In *Thurman*, the witness was alleged to have falsely denied that he received leniency in exchange for testimony. *Thurman*, 337 Ill. App 3d at 1031. In *Lucas*, the witness denied being compensated when he had received a number of benefits in exchange for his testimony. *Lucas*, 203 Ill. 2d at 419-20. We have recognized, however, that mere inconsistencies in testimony are not equivalent to perjury, nor do such inconsistencies "establish or show that the State knowingly used perjured testimony." *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002).

¶ 49    In this case, the record does not support Mr. Thorn's claim that the State "knowingly" used "perjured" testimony. Ms. Jones testified at the pretrial hearing that she was not able to make an identification of the "persons in the pictures." She also indicated that Mr. Thorn was in one of those pictures, which suggests certainly that she looked at them. At trial, Ms. Jones testified she did not examine the photos, although the detectives put them "out," because she wanted to see the shooter in person. However, Ms. Jones never clearly stated in her pretrial suppression hearing testimony that she examined the photographs, only that she knew that one of them was of Mr. Thorn and that she was unable to make an identification from them. She was never asked why she was unable to make an identification. Thus, Ms. Jones's trial testimony did not directly contradict her pretrial testimony and she clarified in her redirect testimony at trial that she never made an identification from the photographs because she wanted to see an in-person line up. Even if there was some inconsistency between Ms. Jones's pretrial testimony and her trial testimony, this was not the equivalent of perjury at trial. Mr. Thorn cannot demonstrate that the State knowingly used perjured testimony to convict him.

¶ 50    More importantly, in contrast to the cases that Mr. Thorn relies on, in this case the jury was fully aware of any inconsistencies in Ms. Jones's testimony. In *Olinger*, the perjury was not revealed until an affidavit attached to the postconviction petition revealed for the first time that the witness had gotten his "multijurisdictional deal" in exchange for testifying. *Olinger*, 176 Ill. 2d at 597. In *Lucas*, an affidavit attached to the postconviction petition revealed that a witness had been compensated for his testimony against the defendant. *Lucas*, 203 Ill. 2d at 419-20. In *Thurman*, the defendant attached documents to his postconviction petition that he claimed showed that a witness against him received leniency in exchange for his testimony at the defendant's trial.

*Thurman*, 337 Ill. App 3d at 1031. The essence of these due process claims was that the State kept the jury in the dark about what deals it had struck with its own witnesses. See *Olinger*, 176 Ill 2d at 600-601. As our supreme court noted in *Olinger*, a due process violation occurred in that case because the result might have been different if "the jury had been informed." *Id.* at 600.

¶ 51    In this case, defense counsel asked Ms. Jones about her prior testimony on cross-examination, and she fully acknowledged that testimony. Then, on redirect, Ms. Jones again acknowledged her prior testimony but clarified that she was unable to make an identification because she did not want to look at the photos and knew the photos were in color because she noticed them when the detectives pulled them out. This clarification was corroborated by Detective Butler, who also testified that Ms. Jones refused to look at the photo array. In closing argument, defense counsel again brought the inconsistencies to the jury's attention, arguing Ms. Jones was not credible and questioning why she denied looking at the photographs that "she already testified a year ago she looked at." The inconsistencies were fully explored at trial and the jury found Mr. Thorn guilty despite them. Thus, Mr. Thorn was not deprived of his right to due process.

¶ 52    Under these circumstances, Mr. Thorn failed to demonstrate prejudice from appellate counsel's failure to raise the claim that the State used Ms. Jones's perjured testimony at his trial. Because of the nature of the inconsistency between Ms. Jones's trial testimony and her pretrial testimony, the use of her testimony at trial does not appear to have been a knowing use of perjured testimony by the State. Also, any inconsistency was fully disclosed to the jury at trial. The failure to raise this claim was not ineffective assistance of appellate counsel. See *Lacy*, 407 Ill. App. 3d at 457 (where an underlying issue lacks merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal).

¶ 53                                    IV. CONCLUSION

¶ 54    Accordingly, Mr. Thorn failed to make a substantial showing of a constitutional violation

and the circuit court properly dismissed his postconviction petition at the second stage.

¶ 55    Affirmed.