2020 IL App (1st) 182237-U

THIRD DIVISION
September 30, 2020

No. 1-18-2237

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 7109 |
| | ) | |
| KENYATTA WHITE, | ) | Honorable |
| | ) | Diane Gordon Cannon, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justice Cobbs concurred in the judgment.
Justice Ellis dissented.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County dismissing defendant's postconviction petition after a second-stage hearing on the State's motion to dismiss is affirmed; the petition fails to make a substantial showing defendant is actually innocent or was subject to a due process violation; the petition fails to make a substantial showing defendant received ineffective assistance of counsel at trial based on the failure to call a witness or to impeach a witness; the petition fails to make a substantial showing the trial court denied defendant his right to counsel of his choice; and the petition fails to make a substantial showing of a *Brady* violation or the knowing use of perjured testimony.

¶ 2    In 2003, the circuit court of Cook County convicted defendant, Kenyatta White, of the

first degree murder of Aramein Brown. This court affirmed defendant's conviction on direct

appeal. Defendant filed a petition for leave to appeal (PLA) to our supreme court. Our supreme

court granted defendant's PLA and, in 2011, our supreme court affirmed the appellate court's

judgment on different grounds than those relied upon by the appellate court. In 2012, defendant,

with the assistance of counsel, filed a petition for postconviction relief. The trial court dismissed

defendant's petition at the first stage of postconviction proceedings and defendant appealed.

This court reversed the first-stage dismissal of the petition and remanded for second-stage

proceedings. Defendant filed a "supplemental petition for postconviction relief" (hereinafter,

collectively, "petition"). Following a hearing on the State's motion to dismiss the trial court

dismissed defendant's petition for postconviction relief.

¶ 3    For the following reasons, we affirm the trial court's dismissal of defendant's

postconviction petition.

¶ 4                                      BACKGROUND

¶ 5    Both this court and our supreme court have already extensively recounted the evidence

adduced at defendant's trial. In fact, our supreme court disagreed with this court's determination

that the evidence in defendant's case was closely balanced for purposes of plain error review and

in doing so it "set forth an extensive recitation of the evidence, testimony, and arguments

presented below." *People v. White*, 2011 IL 109689, ¶ 3. We will not repeat that exercise here.

For context for the postconviction allegations it will suffice to say the victim was shot and killed

at a gas station in Chicago. Although multiple eyewitnesses identified defendant as the shooter,

through photo identifications and in-person lineups, in police interviews and in grand jury

testimony, defendant's trial was marred by questionable motives and shifting testimonies and

recantations. The evidence suggested defendant was a known criminal leader in the

neighborhood where the shooting took place, the victim and his family were also involved in

criminal activity, and many of the witnesses feared retaliation by defendant and/or the victim's

families. Ultimately, however, disinterested witnesses provided consistent, unequivocal evidence of defendant's guilt.

¶ 6 Most notably, Sherry Collier testified she was new to the neighborhood when the murder took place. She was at the gas station using a pay phone when the shooter approached the gas station on foot. The shooter stopped right next to her at which point Collier got a good look at him. Collier saw the shooter approach the victim, shoot, and jog away. Collier identified defendant as the shooter from a photo array, lineup, and in open court as the shooter. The State adduced the testimony of multiple police detectives, investigators, and Assistant State's Attorneys involved in the investigation of the murder. The State's witnesses testified to, *inter alia*, witnesses' out-of-court identifications of defendant as the shooter.

¶ 7 At the close of the State's case the defense made a motion for a directed finding. The trial court denied the motion. In doing so the trial court noted it found the testimony of Martina Brewer, who was with the victim when he was killed, identifying defendant before the grand jury, her statements to police identifying defendant, and her out-of-court identification of defendant, more credible than her in-court recantation of her identification of defendant. The court found that Sherry Collier's testimony supported Brewer's testimony, and that Shawn Davis corroborated defendant's flight from the scene.

¶ 8 The defense proceeded to present its case. The defense witnesses either testified they saw the shooter and that it was not defendant, equivocated their prior identifications of defendant, or attempted to provide defendant with an alibi.

¶ 9 Following closing arguments the trial court found defendant guilty of first degree murder.

¶ 10 On the day of the scheduled hearing on defendant's posttrial motions defendant's attorney informed the trial court that defendant wanted a different attorney to represent him for

posttrial proceedings and sentencing. Defendant's desired new attorney (hereinafter, "second attorney" or "new attorney") was not able to be in court that day due to being in a trial and defendant's then-attorney requested a continuance for defendant's second attorney to file an appearance and "until [defendant's second attorney] gets up to speed." The trial court informed defendant he could have another attorney for his appeal but defendant's second attorney was "not here today, we're having post-trial motions and sentencing today, so pass the case and I'll give you [(defendant)] a chance to speak with [your current attorney] and go over the pre-sentence investigation, see if there's any additions, deletions or corrections." Defendant's then-attorney informed the court defendant's second attorney had met with defendant in the jail. The court was unmoved, stating the second attorney knew where the courtroom was and he was not there, so defendant's then-attorney would "be the only attorney here today unless another one should come in before we start post-trial motions and sentencing." When proceedings resumed the trial court proceeded with the hearing on defendant's then-attorney's posttrial motion. At the conclusion of the hearing the court denied the posttrial motion. The parties then proceeded with the sentencing hearing after which the trial court sentenced defendant to 55 years' imprisonment in the Illinois Department of Corrections.

¶ 11   Turning our attention to the subject of this appeal, defendant's petition and supplemental petition for postconviction relief (hereinafter, collectively "postconviction petition") alleges the conviction violates defendant's constitutional rights in several ways. The postconviction petition as a whole puts forth an alternative narrative of the murder of Aramein Brown. According to the allegations of the petition, the events culminating in the murder of Aramein Brown began in winter 2002 with a home invasion and robbery at the home of Latonya Watson. Watson's brother Lawrence was allegedly a drug dealer and high-ranking member of a street gang and she

believed the invaders thought her home contained drugs and money. Watson thought she recognized one of the invaders as Aramein Brown. Watson reported the home invasion to her bother Lawrence, who relayed the information to (1) two men described as "hit men" for the street gang: Marshawn Laws and Daryl Boston; (2) a drug dealer: Asim Akbar; and (3) Lawrence and Watson's other brother: David Jennings (hereinafter, collectively, "the gang members"). Jennings is also Aramein Brown's cousin as well as cousin to Aramein's two brothers: Ajani Brown and Sundiata Brown. The Browns were members of a rival street gang. The aforementioned individuals learned information that led them to believe Ajani Brown committed the home invasion and initially targeted him for revenge but were unsuccessful. The gang members then turned their attention to Aramein Brown for revenge.

¶ 12    Aramein frequently purchased marijuana from Akbar. On January 6, 2003, Aramein asked Akbar to sell Aramein some marijuana and the two arranged to meet at the scene of the murder for the transaction. Akbar and Jennings informed Laws and Boston of the location. Laws and Boston went to that location to kill Aramein. Aramein arrived with Martina Brewer followed by Akbar and Jennings. Akbar engaged in the marijuana sale at which point Boston crossed the street, entered the gas station parking lot, and opened fire on Aramein. Laws went back to their vehicle parked on the adjacent street and got in the driver's side. Boston returned to the car and the two drove away. In the meantime, Jennings called Ajani to tell him Aramein had been shot. Ajani and Sundiata then allegedly went to the scene of the crime.

¶ 13    Once Ajani and Sundiata arrived, Ajani told Brewer to tell police that defendant shot Aramein. Ajani threatened Brewer's child for Brewer's noncompliance. Brewer testified to Ajani's threat at trial. The petition includes the affidavit of David Jennings who averred that Ajani Brown also threatened him to implicate defendant. Ajani specifically ordered Jennings to

provide a statement implicating defendant to federal authorities. Jennings, accompanied by his attorney, complied. The petition also included an affidavit by Blessth Beacham. Beachem averred that years after the murder Ajani admitted to her that Ajani "framed" defendant for Aramein's murder.

¶ 14 Following arguments, the trial court found Brewer's in-court recantation of her prior statements, which were allegedly false and owing to Ajani's threats, to be incredible. The court found defendant guilty of the first degree murder of Aramein Brown and scheduled the matter for posttrial motions and sentencing. On the date set for posttrial motions and sentencing defendant, through trial counsel, informed the court defendant wished a different attorney to represent him for posttrial motions and sentencing. Defendant's attorney requested a continuance to permit the new attorney to appear. The trial court denied defendant's request and the matter proceeded on defendant's then-current attorney's posttrial motion and sentencing.

¶ 15 After sentencing defendant filed a direct appeal to this court on the grounds police denied him his right to counsel when they did not permit defendant's trial attorney to be in the same room as the witnesses viewing an in-person line up with defendant. This court affirmed defendant's conviction. This court found that the police department's "policy of excluding defense counsel from the witness room at the moment of identification *** violates an accused's sixth amendment right to counsel." *People v. White*, 395 Ill. App. 3d 797, 818 (2009) (*White I*). Nonetheless, this court held that "defendant's right to counsel under the sixth amendment had not attached at the time of his lineup." *White I*, 395 Ill. App. 3d at 824. This court also held that the trial court did not deny defendant his right to counsel of his choice by denying his new attorney's request for a continuance to file an appearance because "the State produced sufficient evidence to overcome the presumption in favor of defendant's chosen counsel and support a

finding that a serious potential for conflict existed." *White I*, 395 Ill. App. 3d at 829. Defendant filed a petition for leave to appeal to our supreme court solely on an issue not preserved at trial: denial of defense counsel's right to observe the witnesses as they viewed the lineup. Our supreme court affirmed defendant's conviction but it affirmed on the basis that the evidence in defendant's case was not closely balanced and, therefore, defendant's claim the police violated his right to counsel, which defendant had forfeited for review on appeal, was not reviewable for plain error. In doing so, our supreme court expressly reversed this court's determination the evidence was closely balanced. *White*, 2011 IL 109689, ¶ 153 (*White II*). Our supreme court held that "[i]rrespective of whether the right to counsel had attached, or whether the lineup procedure violated that right, the result would not have been otherwise because evidence of the lineup did not make a difference in the outcome." *Id.* As a result our supreme court rejected "that part of the appellate court's opinion that discussed, and rendered holdings on, the issues of attachment of the right to counsel and the lineup procedure employed in this case." *White II*, 2011 IL 109689, ¶ 154.

¶ 16 While defendant's appeal to our supreme court was pending Laws allegedly came forward and provided an affidavit stating that defendant did not shoot Aramein Brown and implicating Boston as the real killer. Defendant's petition for postconviction relief is supported by Laws's affidavit and an affidavit by Laws's attorney. The exact contents of Laws's affidavit will be discussed in resolving defendant's postconviction claims based thereon.

¶ 17 The postconviction petition makes the following claims, not all of which defendant pursued on appeal:

1. Defendant is actually innocent.

2. Due process requires a new trial at which defendant can present evidence of Laws's confession even if his admissions are not so conclusive as to support a claim of actual innocence.

3. Defendant received ineffective assistance of counsel based on his trial attorney's failure to call Sundiata Brown as a witness to corroborate Brewer's testimony of coercion by testifying that Ajani and Sundiata went to the scene of the murder immediately after the shooting.

4. Defendant received ineffective assistance of counsel based on his trial counsel's failure to impeach Collier with her initial statement to police.

5. Defendant received ineffective assistance of counsel based on trial counsel's failure to elicit independent expert ballistics testing on an automatic weapon recovered from an address shared by Jennings.

6. Defendant received ineffective assistance of counsel based on his appellate attorney's failure to raise the following issues on direct appeal:

   a. The trial court denied defendant his right to counsel of his choice by denying defendant's motion for a continuance to permit his new attorney to file an appearance.

   b. The claim the trial court denied defendant his right to counsel during the lineup is reviewable under the second prong of the plain error test.

   c. Defendant's trial counsel was ineffective in failing to move to suppress the lineup on the grounds police did not permit defendant's trial attorney to observe the witnesses making the identification.

      d.      Trial counsel was ineffective in failing to move to suppress the lineup on the grounds there was an eight-day delay between defendant's arrest and his first appearance before a judge.

      e.      Trial counsel was ineffective in failing to move to suppress defendant's photographic identifications on the grounds the photo array police used was suggestive.

      f.      Trial counsel was ineffective in failing to move to suppress defendant's lineup identifications on the grounds the lineup police used was suggestive.

7. The cumulative errors in the proceedings leading to defendant's conviction violated defendant's right to a fair trial.

8. The State violated defendant's right to due process by failing to disclose that Davis recanted his identification of defendant as the man running from the scene of the murder.

9. The State violated defendant's right to due process by knowingly using Davis's perjured testimony that defendant was the person Davis saw running from the scene of the murder.

¶ 18    Defendant supported the petition with the following evidence pertinent to the issues on appeal:  (1) an affidavit from Monte Dawson; (2) a Drug Enforcement Agency report summarizing an interview of Sundiata Brown; (3) an affidavit from David Jennings; (4) an affidavit from Blessth Beacham; (5) a State's Attorney's "felony minute sheet" listing, *inter alia*, witnesses; (6) an affidavit from defendant's appellate attorney and an attached letter to the attorney from Laws; (7) Laws's own affidavit; (8) a Chicago Police Department general offense case report of the murder; (9) a letter from defendant's trial attorney to Jennings; (10) Davis's affidavit; and (11) defendant's affidavit.

¶ 19    Following a hearing on the State's motion to the trial court dismissed defendant's petition for postconviction relief.

¶ 20    This appeal followed.

¶ 21                                    ANALYSIS

¶ 22    The Post-Conviction Hearing Act (Act) provides a mechanism for individuals convicted of crimes to mount a collateral attack on their conviction or sentence by asserting that the conviction or sentence resulted from a substantial denial of their constitutional rights. *People v. Simms*, 2020 IL App (1st) 161067, ¶ 21. The trial court denied defendant's postconviction petition at the second stage of the postconviction process. At the second stage, the State may file a motion to dismiss the petition. *White I*, 395 Ill. App. 3d 797. On review of a judgment at the second stage granting a motion to dismiss a petition for postconviction relief the question for this court is whether the well-pled allegations in the petition make a substantial showing of a violation of the defendant's constitutional rights. *People v. Lopez*, 2015 IL App (1st) 142260, ¶ 18. A well-pled allegation is one that is not positively rebutted by the record; and a "substantial showing" is a showing that those well-pled allegations, "if proven at an evidentiary hearing, would entitle [the] defendant to relief." *Id.*, citing *People v. Domagala*, 2013 IL 113688, ¶ 35. We conduct this inquiry *de novo* (*id.*, citing *People v. Garcia*, 405 Ill. App. 3d 608, 614 (2010)), meaning without deference to the trial court's judgment or its reasoning (*People v. Johnson*, 2019 IL App (1st) 162999, ¶ 48).

¶ 23    Regarding defendant's first argument on appeal based on actual innocence, the requirements for making a substantial showing of actual innocence are that:

> "the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New

evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the defendant's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.] This standard 'is extraordinarily difficult to meet.' [Citation.] The conclusiveness of the new evidence is the most important element. [Citation.]" *Simmons*, 2020 IL App (1st) 170650, ¶ 35.

Defendant separately argues he has a due process right to a new trial in which he can present evidence that third parties admitted they committed the murder. Specifically, defendant claims both Laws and Jennings have made hearsay statements to private investigator Monte Dawson indicating they and fellow gang members, not defendant, killed Aramein Brown. Defendant argues their hearsay statements bear sufficient indicia of reliability to be admitted at trial and he has made a substantial showing that his "due process right" as proscribed in *Chambers v. Mississippi*, 410 U.S. 284 (1973) and *People v. Tenney*, 205 Ill. 2d 411 (2002) entitles defendant to a new trial at which he can present their hearsay statements to the trier of fact. However, this argument clearly fails. "[A] freestanding claim of innocence is not cognizable as a fourteenth amendment due process claim." *People v. Washington*, 171 Ill. 2d 475, 485 (1996), citing *Herrera v. Collins*, 506 U.S. 390 (1993).

¶ 24     Returning to the claim of actual innocence in the petition, defendant argues he made the required substantial showing because defendant has submitted postconviction affidavits showing he did not commit the murder. Defendant specifically bases his argument on (1) Jennings's

averments that he saw the person who shot Aramein Brown, defendant was not that person, and other evidence that Jennings knew of a plot by the Browns's street gang to murder Aramein; and (2) Laws's unsworn admissions he and other members of his gang plotted to kill Aramein Brown in revenge for a home invasion. Defendant further argues Jennings's statements constitute "newly discovered evidence" because, although Jennings was known at the time of trial, he refused to speak with police or attorneys on the case at the time of trial. Defendant does not expressly argue how the other evidentiary material attached to the petition on which he relies for this argument constitutes newly discovered evidence. Regarding said evidentiary materials, in factual support of his argument on appeal defendant relies primarily on the affidavits attached to the petition of Monte Dawson and David Jennings. Defendant also relies to a lesser degree on a portion of a summary of an interview by the DEA of Sundiata Brown and Blessth Beacham's affidavit.

¶ 25     First, the State responds (1) Jennings, as a witness, is not "newly discovered evidence" because "defense counsel knew of David Jennings' existence and location, and attempted to interview him;" (2) defendant failed to show the availability of Jennings's testimony for retrial given Jennings's "expressed refusal to testify to 'the contents of his interview with [Investigator] Dawson' and [Jennings's] 'stated reluctance to speak' with the defense attorney and investigator;' " (3) Jennings's statements are not of such conclusive character that they would probably change the result of the trial because Jennings "could be impeached with his prior counseled identification of [defendant] as the murderer" and he cannot identify the "actual" shooter; and (4) Jennings's statements in his affidavit are at least partially cumulative of Akbar's testimony at trial. Second, the State responds defendant failed to make a substantial showing of actual innocence with Laws's affidavit because (1) Laws's statements are not "newly discovered

evidence" where the petition fails to establish defendant could not have discovered Laws as a witness with the exercise of diligence or state that Laws was unknown to defendant; (2) the petition fails to show the availability of Laws's evidence; (3) Laws's affidavit is cumulative of trial evidence that defendant was not the shooter and of defendant's alibi, and is missing important details about the murder; (4) Laws's testimony would not be of such conclusive character that it would likely change the result of the trial where Laws "merely stated that [defendant] was not the shooter" but Laws's affidavit "did not provide an identity, a description, or even details of what he witnessed of the shooting;" (5) Laws's testimony is merely contradictory of Akbar's testimony, which defendant elicited, thus defendant is erroneously trying to establish a claim of actual innocence by attacking the validity of his own evidence, and our supreme court's decision in *People v. Robinson*, 2020 IL 123849, does not alter this result at the second stage of postconviction proceedings.

¶ 26    To resolve this dispute we must first look to the witnesses' averments.  First, Laws. Laws specifically averred:

> "1.    I was at the corner of 79th and Yates on January 6, 2003 when Ajani 'Jamu' Brown's brother, Aramein 'Aki' Brown, was shot and killed.
>
> 4.    I saw the person who shot Aki.
>
> 5.    Although I do not know Kenyatta White personally, I had seen him around from time to time before this shooting and recognized him when I saw him.
>
> 6.    Kenyatta White was not the man I saw shoot Aki Brown."

Laws's affidavit, which he executed in May 2012, does not state Laws would testify at an evidentiary hearing on defendant's petition.

¶ 27    Next, Jennings.  The relevant averments in Jennings's  affidavit are:

"7.     I saw the man who shot my cousin, Aramein, and it was not Kenyatta White. The guy who shot my cousin was smaller, much younger guy than Kenyatta White.

9.     I called one of my cousins [(earlier identified as Aramein 'Aki' Brown, Ajani 'Jamu' Brown, and Sundiata 'Sunny' Brown)] to let them know what had happened.

14.     [Ajani] continued to threaten me. Ajani told me to say that Kenyatta White shot Aramein, and said that if I didn't say that, he would harm me.

15.     Days later, Ajani told me that I should go make a statement to 'the feds' about Aramein's death. I went, along with *** my lawyer in the case for which I was out on bond. [My attorney] had also represented my cousins, the Browns, in some cases.

16.     Prior to this month, I have never spoken with any lawyer or investigator for Kenyatta's (*sic*) White, but even if they had tried to contact me, I would not have spoken with them. I did not speak with the Chicago police about this. I was very emotional; I had my own case, and I just did not want to be involved any more than I already was.

17.     Even now, I was reluctant to speak with the lawyer and investigator who came to see me this month, and even more reluctant to give them an affidavit. Aramein Brown was my cousin, and I hate to make my family sad or angry. However, I know that Kenyatta White did not shoot my cousin, Aramein, and I am giving this affidavit now because I feel it is the right thing to do."

Jennings executed his affidavit in June 2012. Notably, in his 2012 affidavit Jennings never avers (1) that he knew or how he would have recognized Kenyatta White or (2) that he would testify at an evidentiary hearing.

¶ 28     Defendant also attached an affidavit by Monte Dawson to the petition. Dawson averred he is an investigative consultant hired to interview witnesses for defendant's postconviction

investigation. As it pertains to this issue on appeal, Dawson averred he interviewed Laws in April 2012. Dawson averred that Laws told Dawson that after Ajani Brown made certain statements in front of Lawrence, Laws, Akbar, and Jennings, they "vowed to get revenge against Ajani" for the home invasion" and "involved a man named Daryl Boston *** who, like Laws, was a hit man for the [gang.]" Dawson's affidavit states that Laws told Dawson that Boston was the person who entered the gas station parking lot and started shooting at Aramein. Dawson further averred: "Although Laws was willing to provide this information, he was not willing to sign an affidavit implicating Boston and others in the shooting. Laws said that Boston is a professional killer and that he feared Boston would harm his entire family if Laws implicated him in the murder of Aramein Brown. Laws said that Boston knows his entire family and where they live."

¶ 29    Dawson also averred that in June 2012 he interviewed Jennings. Dawson averred that Jennings told Dawson about Aramein's murder, and that Jennings saw the shooter. However, Dawson averred, Jennings "was reluctant to sign an affidavit. He refused to sign an affidavit at that time. Jennings also stated that he would refuse to testify in court, and that he would 'plead the Fifth,' if brought to court." However, Dawson averred he later learned that Jennings had agreed to sign an affidavit. Dawson returned an obtained Jennings's June 2012 affidavit. Dawson then averred that Jennings told Dawson "off the record" that he knew of a "crew" in the Browns's gang which intended to kill Aramein based on a belief Aramein was involved in the home invasion. Dawson specifically averred that "Jennings was emphatic that he would never give an affidavit or testify concerning this matter, because it involved his family."

¶ 30    Mindful of Jennings's lack of detail about the crime or the offender in his affidavit and Laws's failure to state he knew or even recognized defendant, we find defendant has failed to

make the requisite substantial showing of actual innocence necessary to survive second-stage dismissal of a postconviction petition but for a different reason. See *People v. Sanders*, 2016 IL 118123, ¶¶ 47-53 ("We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt."), distinguished in *Robinson*, 2020 IL 123849, ¶¶ 58-59; see also *id.*, ¶¶ 73, 76 (noting affidavit in that case "substantiates, with detailed circumstantial evidence, the occurrences of" the offenses, and "presents new evidence of significant details that are missing from the record" while providing "evidence that a different party is guilty, which is of such a conclusive character as to lead to a different result on retrial").

¶ 31     In addition to the requirements set forth above (see *supra*, ¶ 23, citing *Simmons*, 2020 IL App (1st) 170650, ¶ 35), "[t]he affidavits which accompany a post-conviction petition must identify with reasonable certainty the sources, character *and availability* of alleged evidence supporting petitioner's allegations." (Emphasis added.) *People v. Johnson*, 154 Ill. 2d 227, 240 (1993). In *People v. Brown*, 371 Ill. App. 3d 972, 980 (2007), overruled on other grounds by *People v. Young*, 2018 IL 122598, the defendant argued the trial court erred in dismissing the defendant's claim of ineffective assistance of counsel based on a failure to present an alibi defense at the second stage of postconviction proceedings. In support of his claim of ineffective assistance of counsel the defendant attached an affidavit by his co-defendant Smith. *Id.* at 981. The *Brown* court found Smith's affidavit "insufficient to merit further consideration" in part because "Smith does not affirmatively aver that he would have testified to the contents of his affidavit at [the] defendant's trial." The *Brown* court noted that an affidavit in support of a postconviction petition "must not only identify the source and character of the evidence, it must also identify the availability of the alleged evidence." *Id.* at 982, citing *People v. Johnson*, 183

Ill. 2d 176, 190 (1998). The court held the defendant's claim of ineffective assistance of counsel must fail. *Id.* Similarly, this court affirmed a trial court's decision an affidavit in support of a postconviction petition was "flawed because it did not contain a statement that [the affiant] would actually testify to the facts alleged in the affidavit." *People v. Jones*, 399 Ill. App. 3d 341, 366-67 (2010), citing *Brown*, 371 Ill. App. 3d at 982. The *Jones* court also found *Johnson* instructive, where our supreme court "determined that the 'allegations must be accompanied by an affidavit which identifies with reasonable certainty the *** availability of the alleged evidence.' [Citations.]" *Id.* at 366-67, quoting *Johnson*, 183 Ill. 2d at 190.

¶ 32    Laws nor Jennings averred they would testify to the facts alleged in their affidavits. Jennings expressly stated he would refuse to testify. Laws expressed reluctance at even providing his affidavit, stating only that defendant was not the person he saw shoot Aramein; and although Laws allegedly knew the identify of "the real shooter," he flatly refused to implicate that person in an affidavit. Defendant failed to identify the availability of the evidence in support of his actual innocence claim with reasonable certainty. *Id.* Accordingly, this claim must fail. *Brown*, 371 Ill. App. 3d at 982.

¶ 33    Turning to defendant's next argument, to survive the second stage defendant's petition was also required to make a substantial showing defendant received ineffective assistance of counsel based on his trial attorney's failure to call Sundiata Brown as a witness to testify that Sundiata and Ajani went to the crime scene immediately after the murder, to corroborate Brewer's testimony Ajani came to the scene immediately after the shooting and to rebut the State's evidence Ajani had no opportunity to coerce Brewer into implicating defendant before she initially identified defendant to police. "[W]hen a defendant raises a claim of ineffective assistance of counsel in a postconviction petition based on counsel's failure to investigate or call

a witness to testify, the petition may properly be dismissed at the second stage—whether an affidavit [from the witness] is attached or not—if the evidence presented in support of the claim does not make a substantial showing that counsel was ineffective." *People v. Dupree*, 2018 IL 122307, ¶ 40.

"Claims of ineffective assistance of counsel are judged under the two-pronged standard set forth in *Strickland* and adopted by this court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under this standard, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Citation.] To satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment' and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy. [Citations.] This is a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel. [Citations.] In addition, even when a defendant can show deficient performance, the second prong requires the defendant to show that he was prejudiced as a result. That is, a defendant must show that counsel's deficiency was so serious that it deprived him of a fair trial. [Citation.]" *Id.* ¶ 44.

Moreover, "[i]n cases where a postconviction petitioner raises a claim of ineffective assistance based on counsel's failure to call a witness, an affidavit from the proposed witness will be required if it is essential for the postconviction petitioner to make the necessary 'substantial

showing' to support a claim of ineffective assistance." *Id.* ¶ 34. But an affidavit is not required in all instances. *Id.* "[T]here can be no substantial showing of ineffective assistance of counsel for failure to *** call a witness if there is no evidence that the exculpatory evidence actually exists." *Id.* ¶ 37.

¶ 34    In this case, defendant argues he made a substantial showing trial counsel's performance fell below an objective standard of reasonableness because "trial counsel made the grievous error of failing to call a witness, Sundiata Brown, who could have corroborated [his] defense" where Sundiata made a statement to the DEA that "he and Ajani Brown received a call immediately after Aramein was shot and immediately went to the gas station *** arriving before Aramein was taken to the hospital." Defendant argues he made a substantial showing of prejudice because, absent Sundiata's testimony, the evidence "left the impression that ][Brewer] was lying about Ajani Brown coming to the scene and that the Browns had absolutely no opportunity prior to [Brewer's] statements to police to threaten or influence [Brewer] into implicating [defendant.]" Defendant argues, there is, therefore, "a substantial showing that there is a reasonable probability that the outcome of [defendant's] trial would have been different had Sundiata been called to testify at trial."

¶ 35    As noted above, our supreme court has instructed that "there can be no substantial showing of ineffective assistance of counsel for failure to *** call a witness if there is no evidence that the exculpatory evidence actually exists." *Id.* ¶ 37. Defendant did not attach Sundiata' Brown's affidavit stating he and Ajani went to the gas station after Aramein's murder or that he would testify to that fact at a retrial. Assuming for purposes of determining whether defendant's postconviction petition should advance to a third-stage evidentiary hearing that Sundiata's statement to the DEA can be considered, even though the statement is not recorded in

another person's affidavit (see generally *Robinson*, 2020 IL 123849, ¶ 80 (holding that in accordance with Illinois Rule of Evidence 1101(b)(3) (eff. Sep. 19, 2019) a third-party confession set forth in a different witness's affidavit "must be considered in evaluating petitioner's actual innocence claim") we nonetheless find the evidence fails to make a substantial showing of ineffective assistance of counsel. On appeal, defendant argues the report of Sundiata's DEA interview "reveals that Sundiata Brown admitted *** that he and Ajani Brown *** immediately went to the gas station on 79th and Yates, arriving *before* Aramein was taken to the hospital." That is not entirely accurate. The DEA report states as follows:

> "16.  On January 6, 2003, Brown stated that he was at his grandmother's house located at 73rd Street and Constance with his brother, Ajani Brown. While at the house, Brown stated that Ajani Brown received a phone call from their cousin David Jennings telling them of the shooting of Aramein Brown. Brown related that Jennings told Ajani Brown that it occurred at the gas station at 79th and Yates in Chicago, Illinois. Brown then related that he and Ajani Brown went to the scene. *When they arrived, the ambulance containing Aramein Brown was leaving*. He then stated that they went to South Shore Hospital." (Emphasis added.)

Taken as true, Sundiata's statement to the DEA would not contradict the State's evidence the Browns did not have an opportunity to speak to Brewer before police arrived because the statement does not establish the Browns arrived *before* Aramein was taken to the hospital but at best that they arrived simultaneously with Aramein being taken to the hospital. (We can also reasonably infer the ambulance would not leave before police arrived but that inference is not necessary to our disposition.)

¶ 36    Additionally, the DEA report does not state that Sundiata and Ajani spoke to Brewer at the gas station.  The report is vague as to when the Browns spoke to Brewer, stating only that "Brown stated that he learned from Aramein Brown's girlfriend who was with Aramein Brown during the shooting that she and Aramein Brown went to the gas station to meet Jennings and an unknown male to purchase some marijuana."  Based on the foregoing we cannot say this claim in the petition is "supported by the record or by accompanying affidavits."  *Clark*, 2011 IL App (2d) 100188, ¶ 17, citing *People v. Coleman*, 183 Ill. 2d 366, 381 (1998).

¶ 37    Further, we find defendant has failed to make a substantial showing his trial counsel's performance was deficient.

> "Whether defense counsel was ineffective for failure to investigate is generally determined by the value of the evidence that was not presented and the closeness of the evidence that was presented.  [Citation.]  In determining whether a defendant has been denied his right to the effective assistance of counsel, we use a 'fact sensitive analysis,' which seeks to measure 'the quality and impact of counsel's representation under the circumstances of the individual case.'  [Citations.]
>
> As a general rule, whether to present certain witnesses is a tactical decision which will not be reviewed and cannot support a claim of ineffective assistance of counsel.  [Citation.]  However, [a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients.  [Citations.]  Defense counsel has a professional obligation, both legal and ethical, to explore and investigate a client's potential defense.  [Citation.]  It is

fundamental that this obligation necessarily requires discussion by defense counsel with the client regarding a possible defense. [Citation.]

Failure to conduct investigation and develop a defense has been found to be ineffective assistance. [Citation.] In particular, the failure to interview witnesses may indicate incompetence when trial counsel knows of the witnesses and their testimony may be exonerating. [Citations.]" *Clark*, 2011 IL App (2d) 100188, ¶¶ 24-26.

¶ 38 Sundiata was a gang member and drug dealer whose own credibility was highly questionable. The evidence does not establish that defendant's trial counsel failed to interview Sundiata Brown or was unaware of what testimony Sundiata could provide. According to the petition, the report containing Sundiata's statement was found in the file of defendant's trial attorney. Trial counsel had strong tactical reasons not to call Sundiata as a witness. See generally *People v. Kubat*, 114 Ill. 2d 424, 433 (1986) (holding counsel's assistance was not unreasonable in failing to present the testimony of certain alibi witnesses where circumstances "could reasonably lead counsel to conclude that cross-examination could severely damage their credulity," and "would be of questionable value"). In light of Sundiata's credibility issues trial counsel could have reasonably determined his testimony added little value to Brewer's own testimony that Ajani threatened her. *Clark*, 2011 IL App (2d) 100188, ¶¶ 24-26. Even though counsel did not call Sundiata as a witness, defendant's trial attorney did develop this defense with Brewer's testimony. See *id.* Because defendant has failed to make a substantial showing that counsel's performance was deficient or that the alleged error prejudiced him, this claim must fail.

¶ 39 We now turn to defendant's next argument that he received ineffective assistance of counsel at trial, this time based on trial counsel's failure to impeach Collier with allegedly contradictory statements she gave to police compared with her trial testimony as to how the crime transpired. Specifically, Collier testified at trial that Aramein was standing at the gas pumps when defendant shot him. However, according to police reports, Collier told the beat officer who initially interviewed her at the scene that Aramein had already pumped his gas and had driven his vehicle around to the "rear of gas station" before defendant approached him with his hands in his pocket and then proceeded to fire five rounds. Defendant asserts "her multiple versions of the events raise questions about her credibility" and, for that reason, the petition makes a substantial showing that trial counsel's performance was deficient. Defendant further argues the petition makes a substantial showing that there is a reasonable probability the outcome of the trial would have been different had trial counsel impeached Collier in this way because Collier's testimony was the crucial factor in defendant's conviction. The State responds defendant cannot make a substantial showing of either deficient performance or prejudice where defendant's trial attorney conducted a vigorous cross-examination of Collier using the police report at issue. The State argues defendant has demonstrated "at best, the failure to impeach Collier on a collateral point regarding an entry made in a police report."

¶ 40 "[W]e review *de novo* a post-conviction petition that has been dismissed without an evidentiary hearing." *People v. Peeples*, 205 Ill. 2d 480, 511 (2002).

> "The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). [Citations.] Under *Strickland*, a defendant

must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. [Citations.]

Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness 'under prevailing professional norms.' [Citations.] \*\*\*

To prevail, the defendant must satisfy both prongs of the *Strickland* test." *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 41 At trial, defendant's trial attorney questioned Collier about what she told police, including uniformed police at the crime scene, about how she described the shooter that night and what she told them about her opportunity to observe defendant. Trial counsel asked Collier, "you never told that officer that you saw this man [(defendant)] walking down 79th in your direction, did you?" Through cross-examination trial counsel elicited testimony that Collier did not tell police on the scene that defendant has a "distinctive face," said nothing about defendant's facial hair, and said at the scene that the shooter had "a lot of hair" but did not specifically say that defendant had dreadlocks. Trial counsel questioned Collier about whether she told police on the scene that the shooter approached the victim with the gun in his hands or pockets, whether the shooter was wearing a "hoody," and questioned Collier on her statement on that point to detectives. Trial counsel questioned Collier about her ability to recall whether or not another vehicle was present. Trial counsel asked Collier, "you never told the officers at the scene that the man had a long or ugly, or distinctive face, did you?" to which she responded, "No." Collier also testified she did not recall telling officers on the scene that she did not see anyone else in the

lot, and when trial counsel asked if she "didn't happen to say, 'Moments before the shooting, another van pulled out,' you didn't say that?" to which Collier responded, "No." Trial counsel then elicited testimony from the officer who wrote the report that Collier did not tell him defendant had a distinctive face, did not tell him the shooter was wearing a "hoody," and did not tell him that Collier "had long locks or a lot of hair." The officer also testified that Collier told him "that the offender walked toward the victim with his hands in his pockets" and that she never described the style or color of the gun.

¶ 42    Based on the foregoing, we find defendant failed to make a substantial showing that trial counsel's performance fell below an objective standard of reasonableness because he did not question Collier about the location of Aramein's van when defendant shot Aramein.

> "[T]he examination or impeachment of a witness is generally considered to be trial strategy, which does not support a claim of ineffective assistance of counsel. [Citations.] The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court. [Citation.] The only way for a defendant to prevail on his ineffectiveness claim is by showing that counsel's approach to cross-examination was objectively unreasonable. [Citation.]" (Internal quotation marks omitted.) *Lacy*, 407 Ill. App. 3d at 463.

¶ 43    First, as noted by the State, Brewer testified she moved the van after Aramein was shot to the place "right where he was laying" after attempting to get away from the shooter. Thus, the evidence would have corroborated the fact Aramein was shot at the gas pumps rather than the back of the station and any attempt to impeach Collier on this point may have actually bolstered her credibility as a witness. Regardless, trial counsel's strategy was to challenge the strength of

Collier's, and the other witness's, identification of defendant. Trial counsel did so utilizing the very police report defendant now argues counsel failed to utilize and more. Trial counsel, through cross-examination, directly challenged Collier's opportunity to view the perpetrator at the time of the crime, her degree of attention to the perpetrator, and the accuracy of her prior description of the perpetrator. See *People v. Tisdel*, 201 Ill. 2d 210, 234 (2002) (McMorrow, J., dissenting), citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Trial counsel could reasonably choose to forego a point that would have gained him nothing and possibly cost defendant. Trial counsel's performance was not objectively unreasonable under prevailing professional norms. Accordingly, defendant's claim of ineffective assistance of counsel on this point fails. See generally *Domagala*, 2013 IL 113688, ¶ 36.

¶ 44    Next, defendant argues he made a substantial showing he received ineffective assistance of counsel on appeal based on the failure of appellate counsel to raise a claim on direct appeal that the trial court denied defendant his right to counsel of his choice when it denied defendant's request for a continuance for defendant's new attorney for posttrial proceedings to file an appearance and "get up to speed."

> "Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. [Citations.] Appellate counsel is not required to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit. [Citations.] Accordingly, unless the underlying issue has merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal. [Citations.]" *Lacy*, 407 Ill. App. 3d at 457.

¶ 45    "[A] defendant has an unqualified right to assistance of counsel ([citation]) but the right of choice, a part of this fundamental right, is not absolute. ([Citation.]) Therefore, if a request for a particular counsel *** interferes with the orderly administration of justice, the court's denial of the request is not an abuse of discretion ([citation] ). [Citation.] *** The right to choice of counsel is limited when abused, such as through attempts to thwart, delay, or embarrass the effective administration of justice, or when a conflict of interest might arise. [Citations.] But the trial court must specifically make such a finding." *People v. Abernathy*, 399 Ill. App. 3d 420, 431 (2010). To determine whether the trial court has abused its discretion with regard to a defendant's choice of counsel, "relevant factors include whether the request is a guise to temporarily thwart the administration of justice; lack of evidence that new counsel is ready, willing, and able to proceed with the case; *failure of the defendant to articulate an acceptable reason for desiring new counsel; and representation by counsel for a lengthy period of time before the substitution request*. [Citation.]" (Emphasis added and internal quotation marks omitted.) *Abernathy*, 399 Ill. App. 3d at 431. "The decision to grant or deny a continuance for substitution of counsel is a matter left to the discretion of the trial court and will not be overturned absent an abuse of that discretion. [Citation.] Factors to consider in evaluating a trial court's exercise of its discretion include the diligence of the movant *** and the interests of justice. [Citation.]" *People v. Curry*, 2013 IL App (4th) 120724, ¶¶ 48-49.

¶ 46    In this case, we find the trial court specifically made an express finding that defendant's request for a continuance would "delay, or embarrass the effective administration of justice." *Abernathy*, 399 Ill. App. 3d at 431. The trial court noted that defendant's then-attorney had prepared and filed a posttrial motion, the matter was set for hearing on the motion and for sentencing when defendant requested a continuance, and defendant's requested attorney,

apparently in the building for another trial, failed to appear (even briefly that day or sooner) to request the continuance.

¶ 47    Nonetheless defendant argues his claim had merit because in denying defendant's request the trial court focused on the fact the new attorney was not present in court but that "should not have been the end of the court's analysis." Instead, defendant argues, "the granting of a short continuance and of the oral motion for substitution of counsel would not have unduly delayed the administration of justice." Defendant asserts the record demonstrates the new attorney was ready to file an appearance on defendant's behalf, was only not present due to a conflicting trial, and the case was only 30 days past the determination of guilt. The State responds, without citation to record evidence, that the trial court properly exercised its discretion in denying defendant's oral motion for a continuance because defendant "displayed a penchant for waiting until the last minute to attempt to bring in new counsel." The State additionally responds, however, that defendant (1) gave no reason for desiring new counsel, (2) made an inadequate showing to warrant a delay, (3) did not offer up any particular complaint about trial counsel, and, moreover, trial counsel (4) represented defendant for years leading up to the trial, (5) zealously advocated for defendant, and (6) "had fully prepared a post-trial motion and was ready to represent [defendant] at sentencing." The only reason for the delay was that defendant wanted to be represented by his new attorney for posttrial proceedings. We find the trial court did not abuse its discretion.

¶ 48    In *People v. Thomas*, 96 Ill. App. 3d 443 (1981), the defendant argued the trial court erred in denying his request for a 24-hour continuance to obtain counsel of his choosing. *Thomas*, 96 Ill. App. 3d at 452. This court began by pointing out that the right to be represented by the counsel of one's choosing "cannot be employed *** to embarrass the effective

administration of justice." *Id.* We held that "a motion for continuance [in this context] is directed to the court's discretion and a defendant challenging the denial of such motion must show that he was prejudiced at trial by its refusal." *Id.* at 453. "Accordingly, the determination of whether the denial of a continuance violates a substantive right of the accused must turn on the particular facts of the case." *Id.*

¶ 49    Notably, in *Thomas*, unlike here, the attorney representing the defendant "indicated that he was not fully prepared to try the case" where there were two defendants and the first attorney had primarily consulted one but not the other. *Id.* at 446, 453. The court found that the attorney representing the defendant was the second attorney's partner, was representing both defendants on the same charges, was familiar with the case, and that the defendant had allowed the first attorney to represent him up to that point. *Id.* at 453. The attorney was "a highly-experienced trial lawyer who was familiar with the case." *Id.* Further, this court found that the record showed that the first attorney "competently handled the opening statement [and] conducted an intensive cross-examination." *Id.* The attorney for whom the defendant sought a continuance began his representation on the second day of trial. This court held that under the circumstances "it does not appear that [the defendant's] right to counsel was violated nor that [the defendant] suffered any prejudice from the failure to grant his continuance." *Id.*

¶ 50    Then, in *People v. Barrow*, 133 Ill. 2d 226, 251-52 (1989), the defendant argued the trial court abused its discretion in failing to permit a second attorney to become counsel of record at trial and to continue to assist the defendant's primary attorney. Our supreme court first noted that, "[a]s the Supreme Court of the United States declared in *Wheat v. United States*, 486 U.S. 153 (1988), 'while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an

effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.' [Citations.]" *Barrow*, 133 Ill. 2d at 255. In that case, in arguing the trial court had abused its discretion the defendant contended the trial court's refusal to continue the second attorney's appointment was based on financial concerns rather than delaying the proceedings. Nonetheless, our supreme court noted the defendant "offered no persuasive reason why it was necessary to have [the second attorney] assist [the first]" and "[i]n any event, the defendant has failed to show that he was prejudiced by his trial counsel's performance." *Id.* at 254-55. Our supreme court noted that "[t]he record shows that the defendant received effective assistance of counsel throughout the guilt phase of the trial," the first attorney "vigorously cross-examined witnesses, made numerous motions and posed objections when appropriate." *Id.* at 255. The court held "there was no error in the [trial] court's denial of the defendant's motion.

¶ 51     In this case, defendant has not made any complaints about his trial attorney's performance during the trial and has not shown how he was prejudiced by his performance. He has likewise not complained about any prejudice from having his trial counsel represent him for posttrial proceedings. (Defendant has a different attorney for appeal.) Defendant has cited no authority that due to the trial court's expressed concerns about delaying the proceedings our consideration of this case should be different from the considerations in *Barrow*. Thus, based on the guidance *Barrow* offers from our supreme court, we should consider the reasons for defendant's desire to replace trial counsel and any deficiency in trial counsel's performance for posttrial matters. See *id.* at 254-55. Defendant has offered neither; therefore, under *Barrow*, 133 Ill. 2d at 255, we would find no abuse of discretion. See also *Thomas*, 96 Ill. App. 3d at 453.

Accordingly, the underlying issue lacks merit, and defendant's claim appellate counsel rendered ineffective assistance in not raising it fails. *Lacy*, 407 Ill. App. 3d at 457.

¶ 52     Next, defendant argues the petition makes a substantial showing the State violated defendant's constitutional rights at trial by failing to disclose that Shawn Davis recanted his identification of defendant from a photo array and subsequently knowingly using Davis's perjured testimony that defendant was the man Davis saw running from the scene. The United States Supreme Court established the State's "affirmative duty to disclose evidence favorable to a defendant in *Brady v. Maryland*, 373 U.S. 83 (1963)." *People v. Hobley*, 182 Ill. 2d 404, 431 (1998). An alleged *Brady* violation is cognizable under the Post-Conviction Hearing Act. See *id.* at 429. "To establish a *Brady* violation, suppressed evidence must be both favorable to the accused and material." *Hobley*, 182 Ill. 2d at 432-33. "Materiality is shown where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. [Citation.] A 'reasonable probability' of a different result means a 'probability sufficient to undermine confidence in the outcome.' [Citation.]" *Id.* at 435.

> "In assessing materiality, we must keep in mind (1) it does not require a demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal; (2) the focus is on whether, in the absence of the undisclosed information, the defendant received a fair trial, which is a trial resulting in a verdict worthy of confidence; (3) it does not require the defendant to demonstrate that, 'after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict'; and (4) it is defined 'in terms of

suppressed evidence considered collectively, not item by item.' [Citation.]"

*People v. Snow*, 2012 IL App (4th) 110415, ¶ 37.

*Brady* claims under the Act are subject to *res judicata* if the information upon which the claim is

based is found in the trial record upon which the defendant's direct appeal was based. *Hobley*,

182 Ill. 2d at 437-38.

¶ 53    Defendant argues his petition makes a substantial showing the State failed to disclose

favorable and material evidence that "Davis told the prosecutor that he had wrongly identified

[defendant] in a photographic identification and that [defendant] was not he man Davis saw

running from the scene of the shooting." Defendant argues this evidence is favorable and

material because it exculpated defendant and could have been used to impeach Davis, whose

testimony was "one *** linchpin in the State's case." As factual support for his claim defendant

directs this court to the allegations in the petition supported by Davis's affidavit. In it, Davis

avers that:

> "4.    I cannot really describe the man I saw running. I got only a quick glance
>
> at him. He was wearing a dark hoodie with the hood over his head. He had
>
> dreadlocks sticking out of the hood.
>
> 5.    At some point, the police showed me a group of photos and asked me if
>
> the person I had seen running down the block was in the photos. I picked out the
>
> picture of Kenyatta White.
>
> 6.    *** I picked out his photo out of the group because at a glance, the guy I
>
> saw running downs the street and he looked alike. I got only a quick glance at the
>
> guy who was running. Between the time of picking out that photograph and

testifying at [defendant's] trial, however, I wondered if I had picked the right person out of the photos, and concluded that I had not.

7.     On the day that I testified at [defendant's] trial, I *** had a conversation with the State's Attorney who questioned me during my testimony.

8.     During this conversation, I told the State's Attorney that I had picked the wrong guy, and I really don't think it was [defendant.] The State's Attorney responded, 'It was him.' The State's Attorney told me I had already signed and (*sic*) affidavit or statement saying it was [defendant.] The State's Attorney said, 'We're going to go out there. When I ask you who it was, you're going to point at him, and say it was him. If you don't, you're going to be charged with contempt and locked up.'

9.     I wasn't willing to be locked up for anything. So, I did what the State's Attorney told me to do. I testified in court, and I identified [defendant] as the guy I saw running down the street. In reality, it was not him, and at the time of my testimony I knew it wasn't him. I simply did what the State's Attorney told me to do."

¶ 54    Defendant separately argues the petition also makes a substantial showing the State knowingly used perjured testimony "when it elicited in-court identifications from Shawn Davis indicating that [defendant] was the man Davis saw running away from the scene of the shooting" where Davis "told the prosecutor that [defendant] was not the man he had seen running away from the scene." Defendant argues there was a reasonable likelihood the false testimony affected the judgment in this case because Davis "was an important, on the scene witness."

¶ 55    "The knowing use of perjured testimony by the State to secure a conviction of an offense denies defendant's constitutional right to a fair trial and due process of law and constitutes a ground for post-conviction relief. [Citations.]" *People v. Carbona*, 53 Ill. App. 3d 1022, 1025-26 (1977). Where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury" materiality is determined by "whether there is any reasonable likelihood that the false testimony could have affected the judgment." *People v. Harris*, 206 Ill. 2d 1, 51 (2002). "[W]e may affirm the circuit court's decision to dismiss defendant's *Brady* claim without an evidentiary hearing only if we can conclude, as a matter of law, that [the] allegedly false testimony does not fall within this strict standard of materiality." *Id.* at 52.

¶ 56    As noted by the State, where the non-perjured evidence of the defendant's guilt is "overwhelming" our supreme court has found a failure to show a reasonable likelihood that the allegedly false testimony could have affected the jury's verdict. See *Barrow*, 195 Ill. 2d at 533. Similarly, in the same case where evidence of the defendant's guilt was overwhelming the court found there was "no reasonable probability that, even if all the allegedly suppressed evidence had been disclosed to the defense, the result of the defendant's trial would have been different." *Id.* at 537. See also *People v. Lucas*, 203 Ill. 2d 410, 424 (2002), also cited by the State, in which our supreme court held that "because the record contains overwhelming evidence of guilt, in the form of two eyewitnesses who offered identification testimony, we find that [the] defendant does not make the requisite substantial showing" of a due process violation to advance to an evidentiary hearing. *Lucas*, 203 Ill. 2d at 424.

¶ 57    The State responds "the mere fact that Davis claimed in his recantation affidavit that he lied at trial was not enough to establish perjury." The State also argues that "even if Davis's

testimony is deemed to have been perjured, it was not material to [defendant's] conviction in view of the positive identification of [defendant] as the shooter by three other witnesses— Brewer, Slaughter and Collier." The State notes Davis did not see the actual shooting and thus his trial testimony merely serves to corroborate those witnesses's testimony. The State asserts "there was no reasonable likelihood that Davis's testimony would have affected the judgment and, therefore, [defendant] was unable to make a substantial showing of a due process violation under *Brady* and the knowing use of perjury."

¶ 58    We find that given the positive identifications of defendant by individuals who actually witnessed the shooting, even if Davis's alleged recantation, if believed (see, *e.g.*, *People v. Sanders*, 2016 IL 118123, ¶ 33, *People v. Brooks*, 187 Ill. 2d 91, 132-33 (1999) (even assuming a recantation occurred, "it is well-settled that recanting testimony is regarded as very unreliable")), had been disclosed to the defense, there is no reasonable probability that the result of the proceedings would have been different. See *Barrow*, 195 Ill. 2d at 537. At best for defendant, the trier of fact would have been presented with Davis's identifications of defendant close to the time of observation and his recantation years later based, not on something seemingly less than certainty that he identified the wrong man, but only that he "really didn't think it was Mr. White." Compare *People v. Smith*, 2015 IL App (1st) 140494, ¶ 22 ("Because Evans' testimony was the strongest evidence against Smith, its recantation has the capacity, if believed, to produce a different result.").

¶ 59    Our supreme court's decision in *Lucas* is also instructive for its holding that "the issue of whether [the challenged testimony] was so crucial to the State's case that [the] defendant was prejudiced by [the allegedly] false testimony is answered by our decision on direct appeal." *Lucas*, 203 Ill. 2d at 425. In *Lucas*, after discussing the findings in the defendant's direct

appeals, our supreme court held that its characterization of the evidence had not changed and the defendant "was convicted on the basis of overwhelming evidence—the testimony of two eyewitnesses who observed [the] defendant participate in the killing." *Id.* at 427. Strikingly, here defendant was also convicted on the strength of two eyewitnesses who observed defendant commit the killing. See *White II*, 2011 IL 109689, ¶ 142 ("Both Collier and Slaughter *** observed the criminal act, which took place in a well-lit area, but Collier in particular had an excellent opportunity to view the defendant at close range before the shooting started. *** Neither witness previously identified someone other than defendant or failed to identify him as the offender when given the opportunity."). The *Lucas* court also held it could not equate the allegedly perjured testimony, which did not place the defendant at the scene of the attack or with a weapon—to the eyewitnesses' testimony. *Id.*

¶ 60   Accordingly, we find that the instant case does not present facts which demonstrate that there is a reasonable likelihood that the false testimony affected the judgment ***. Because [the] defendant does not establish materiality, the circuit court correctly dismissed [the] defendant's claim without an evidentiary hearing." *Lucas*, 203 Ill. 2d at 427. Davis's allegedly perjured testimony does not put defendant at the scene of the murder but only fleeing the scene. It does not place defendant with a weapon, nor is Davis's challenged testimony the only evidence on an element that was crucial to the State's case. Compare *Lucas*, 203 Ill. 2d at 424 ("testimony, although helpful, was not crucial to the State's case"). Defendant's petition and supporting affidavit fail to demonstrate the allegedly perjured testimony was material. Defendant has also failed to make the required substantial showing that any failure to disclose that Davis recanted his photo identification was material. In light of the foregoing and the fact "the evidence was not closely balanced, as our [supreme court's] evidentiary recitation reveals" (*White II*, 2011 IL

109689, ¶ 139), we cannot say that "in the absence of the undisclosed information, the defendant did not receive[] a fair trial, which is a trial resulting in a verdict worthy of confidence." *Snow*, 2012 IL App (4th) 110415, ¶ 37 ("In assessing materiality, we must keep in mind *** the focus is on whether, in the absence of the undisclosed information, the defendant received a fair trial, which is a trial resulting in a verdict worthy of confidence."). Because defendant failed to make a substantial showing of materiality, we hold defendant's *Brady* claim and his perjury claim in the postconviction petition both fail.

¶ 61    Finally, we address defendant's arguments the petition makes a substantial showing that defendant's appellate attorney was ineffective for failing to make an argument that trial counsel was ineffective in failing to move to suppress defendant's lineup and photo identifications as unduly suggestive. The State argues defense counsel's decision to attack the credibility of the identifications through cross-examination rather than through a motion to suppress was a valid trial strategy; therefore, a claim of ineffective assistance of trial counsel on the basis of that decision would have been meritless and appellate counsel's performance was not deficient in failing to raise it. The State also argues trial counsel did not have grounds to move to suppress the identifications and consequently appellate counsel was not ineffective in not arguing that trial counsel's performance was deficient for not moving to suppress the identifications. *Lacy*, 407 Ill. App. 3d at 457.

¶ 62    The State directs this court to the fact that when the State rested its case the defense made a motion for a directed finding. In arguing that motion, defense counsel attacked Collier's identification of defendant as the shooter. In doing so defense counsel argued:

> "And [Collier] pointed the accusatory finger at [defendant] here in the
> courtroom, and she also identified [defendant] in a photo array and in a line-up.

Your Honor, there's no motion pending, nor have we filed a motion regarding suppression of this photo array or line-up. And the reason being, your Honor, is I don't know how the police department could create a fair line-up with [defendant.] I don't know how they could do it.

When the Court as the trier of facts looks over and looks at [defendant,] there's one thing that is so obvious; and, that is, [defendant's] facial features. We can't get by that. We can't get around that.

When [defendant] walks into a courtroom, that's where all of our eyes are, his features. And for that reasons Judge, I know it was different, probably impossible to create a lineup finding other people that looked like [defendant.]

For that reason, Judge, the fact that individuals stood out and Ms. Collier chose that picture is no surprise. It's not that she saw Mr. White, but Mr. White stood out."

¶ 63   "Whether an attorney's failure to litigate a motion to quash [or] suppress is ineffective assistance of counsel depends on the circumstances of each case. [Citations.] Whether to file pretrial motions to suppress is a matter of trial strategy. [Citation.] Mistakes in strategy or tactics do not, alone, amount to ineffective assistance of counsel." *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). As in *Johnson*, "[b]ased on the facts of the instant case, the record does not reflect ineffective assistance of counsel but, rather, trial strategy in the context of defense counsel's choice to not litigate a motion to quash arrest and suppress evidence" (*Johnson*, 372 Ill. App. 3d at 777–78) and instead to argue that any identification of defendant was based on his outstanding facial features rather than actually identifying him as the shooter. We note this strategy would permit the defense to similarly attack any in-court identification. "A

decision that involves a matter of trial strategy will typically not support a claim of ineffective representation." *People v. Balark*, 2019 IL App (1st) 171626, ¶ 34. Tactical decisions of trial strategy will not support an ineffective assistance of counsel claim unless the chosen tactic is objectively unreasonable. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 84.

¶ 64    Here, we cannot say defendant's trial counsel's decision not to file a motion to suppress was objectively unreasonable. The record demonstrates counsel was aware of issues concerning both the photographic and in-person identifications of defendant and instead of attempting to quash them decided to use them to defendant's advantage. This decision was the product of reasonable trial strategy and therefore we are unable to conclude trial counsel's performance fell below an objective standard of reasonableness.

> "Appellate counsel is not obligated to brief every conceivable issue, and it is not incompetence to refrain from raising issues that, in counsel's judgment, are without merit, unless counsel's assessment is patently wrong. [Citation.] Thus, the prejudice inquiry requires the reviewing court to examine the merits of the underlying issue. [Citation.] Appellate counsel's choices about which issues to pursue are entitled to substantial deference. [Citation.]" *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 72.

¶ 65    A claim of ineffective assistance of trial counsel would have been meritless and appellate counsel was not ineffective in not raising it. This argument must also fail. *Id.* ¶ 77 (holding appellate counsel not ineffective for failing to raise claim on appeal that court found to lack merit).

¶ 66                                    CONCLUSION

¶ 67    For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 68    Affirmed.

¶ 69    Ellis, J., dissenting.

¶ 70    If the evidence set forth in the petition for postconviction review were believed, petitioner did not commit this murder.  In particular, two witnesses signed affidavits stating that they were at the scene of the shooting and saw the shooter—and that shooter was not petitioner.

¶ 71    We make no credibility determinations at this stage; we accept these allegations as true, meaning we accept them as if a factfinder at trial would have not only heard this evidence but believed it. *People v. Robinson*, 2020 IL 123849, ¶¶ 45, 60. It seems to be a simple task to say that, if a factfinder believed the testimony of these witnesses that petitioner did not commit this shooting, the factfinder would acquit petitioner.

¶ 72    The majority does not contend otherwise. The majority does not claim that this evidence is not newly discovered, or that it's immaterial or cumulative. The majority rejects this evidence "for a different reason." *Supra*, ¶ 30. The majority's reason is that this information is not *available*, because it appears that these witnesses will be reluctant to testify under oath at trial or an evidentiary hearing.

¶ 73    These witnesses are not dead or comatose or otherwise incompetent to testify. They are merely reluctant. True, they may ultimately refuse to testify. But they may decide otherwise. Mr. Laws, for example, though indicating his desire to stay out of this affair officially, has been willing to discuss the matter with an investigator, sign an affidavit, and write a letter. If we believe what he is saying, as we must for the time being, he has certainly been able to overcome his reluctance at least to the extent of providing significant information and assistance to petitioner's counsel. Are we so certain that he would refuse to testify, if called to the stand, that

we should close the lid on his (and others') very serious claims of actual innocence without at least giving it a try?

¶ 74    I think we should give petitioner that chance. If the claims made by these witnesses are true, a miscarriage of justice has occurred. We should not close the door to these claims simply because we think the witnesses, ultimately, won't testify under oath. We owe it to petitioner and the justice system to find out if that assumption is true. Subpoena them, put them on the stand, swear them in.  If they refuse to testify or recant, so be it.  But we should not make that decision for them, based on something they've written, a decision they could reverse on a moment's notice. Only by advancing this cause to the third stage and giving petitioner the chance to present this evidence can we be certain that we have given petitioner a fair opportunity to present these serious claims. Abruptly ending the inquiry here on a technicality, and an uncertain one at that, is not justice.